## Case No. 4,675.

FARNUM et al. v. BLACKSTONE CANAL CORP.

[1 Sumn. 46.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1830.

[1] [Reported by Charles Sumner, Esq.]

R. W. Greene and Daniel Webster, for plaintiffs.

J. L. Tillinghast and J. Whipple, for defendants.

STORY, Circuit Justice. Assuming for the present that the evidence makes out a case of real substantive damage to the plaintiffs' mills, by the raising of the Woonsocket dam, the next question is, whether the record presents any justification of the act of raising the Woonsocket dam on the part of the plaintiffs. And it is most important to the parties in this aspect of the case, to advert to some of the facts, which are indisputable. The plaintiffs, in the summer of 1825, built a dam across the Blackstone river in the town of Mendon in the state of Massachusetts, and erected a woollen mill in the same town, the water for which was drawn from the pond formed by this dam, which is called the Blackstone dam or pond. There is no doubt, that this was a legal exercise of the rights of the plaintiffs, as owners of the soil and riparian proprietors. The answer of the defendants does not attempt to impeach it. In March, 1826, the plaintiffs being the owners of the soil began to dig the race-way for their cotton mill, south of the woollen mill and lower down the river, and completed the cotton mill (which is within the boundary of Massachusetts) in the course of the same year. The land through which this race-way was laid, is known as the Mowry land, and the title to it was purchased by the plaintiffs on the 28th of February, 1826. The territorial line between Massachusetts and Rhode Island crosses the race-way just below the cotton mill. The dam at Woonsocket is in Rhode Island, and was not raised until August, 1828, and then, and not till then, did the gravamen complained of by the bill have an existence.

Now, I think, it cannot well be denied, that the acts of the plaintiffs in the erection of their cotton mill, and the use of the water from the canal and dam above it, were strictly legal. They had a right to the flow of the river in its then natural state along the banks of their land, and a right to empty the water from their race-way into the river according to its then natural current, without any obstruction by any subsequent artificial elevation or back-water, unless the canal corporation have acquired some legal right to displace this, which may be called the natural right, or water privilege, annexed to the proprietary interest in the adjacent soil and banks.

The defendants have thrown into their answer a great variety of incidental matters, many of which are not responsive to the bill, and some of which are not made out by any competent proofs. But, stripping the case of this complexity of circumstances, the defendants mainly rely upon two distinct grounds of defence; first, that the act of raising the Woonsocket dam is strictly justified by the authorities conferred upon the corporation by the various acts of the legislatures of Massachusetts and Rhode Island, which are referred to in the case; and, secondly, that, if not so justified, still the indenture of agreement between the parties of the 5th day of June, 1826, (which is also in the case,) furnishes a complete justification, from the manifest objects, which it had in view, and the known circumstances and intentions of the parties which accompanied it.

A good deal has been said, in the course of the argument, upon the point, that the plaintiffs, at and before the time of their purchase of the Mowry land, in February, 1826, had notice, that the location of the canal had been actually made up to Woonsocket dam, and that the level of the canal at that place required the dam to be raised two feet; and so the intent of the canal proprietors to raise it, and the legal appropriation of it for this purpose, must, as necessary presumptions, follow upon such notice. Indeed, it has been contended, that this does not rest upon mere legal inference; but that direct and positive notice to this effect, as matter of fact, is brought home to the plaintiffs. This, however, is strenuously denied on the other side;

and there is, (as we shall hereafter see,) great difficulty in maintaining the affirmative upon the actual posture of the evidence. The question of notice is not, however, of the slightest consequence, if the Woonsocket dam has been justifiably raised, under and in virtue of any authority conferred by any of the charters upon the canal corporation. For under such circumstances it binds the plaintiffs in point of right, whether they had notice of the intent to raise it or not. The only possible view, in which it strikes me, that the notice can be of any avail, is this. If it constituted an actual admitted ground or basis, upon which the agreement of June, 1826, was entered into between the parties, so that it would operate as a legal fraud upon that agreement to suffer the plaintiffs now to assert a right, which that agreement contemplated as extinct, or to be extinguished by its terms, it would be most material as a matter of equitable bar. In all other aspects it seems to me wholly immaterial. It can confer no right on the defendants ipso facto. It would be absurd to say, that notice of an intent to do a wrong amounted to an extinguishment of the plaintiffs' right to seek a remedy for such wrong; or that the plaintiffs, at the peril of losing their property, were bound to make proclamation of their intention to seek redress against wrong-doers. The argument of the defendants' counsel has not, as I comprehend it, attempted to sustain any such large position.

Let us then pass to the main grounds of the defence; and see, whether they are made out by the principles of law applied to the facts. And first, as to the justification under the charters and other acts of incorporation. In June, 1823, the legislature of Rhode Island incorporated a company by the name of the Blackstone Canal Company, and, after giving them the usual corporate powers, authorized them to locate, construct, and fully complete a navigable canal, with locks, towpaths, basins, dams, wharves, embankments, toll-houses, and other necessary appendages, commencing at the dividing line between the states of Rhode Island and Massachusetts, and at that point, which should intersect and connect with a canal, contemplated to be made and constructed from or near the town of Worcester in Massachusetts, down the valley of the Blackstone river, to the aforesaid dividing line, and running into tide-water, in the town of Providence, in such place or places as might be deemed most convenient for the company; with further authority to employ certain ponds as reservoirs and feeders, &c. &c. Many other incidental provisions were made, which it is not necessary to particularize. It was further provided (by the 11th section of the act), that whenever the corporation should have located the said canal, or any part thereof, or the feeders or branches thereto, or any of them, they should make report thereof to the court of common pleas for the county of Providence, at any term thereof, wherein they should particularly describe the bearings of the intended route, or any section thereof, its width, including tow-paths, embankments, basins, wharves, excavations, the reservoirs intended to be constructed or used, and the names of the owners of the land, so far as the same could be ascertained; which report was to be placed on the files of the court, and notice given to the owner of the land, if known; and commissioners were to be appointed by the court to estimate all damages, which any persons, whose lands were described or mentioned in the report, should sustain, provided the canal or feeders, &c. be constructed thereon. The duties of the commissioners were then pointed out; the manner of making their report; the reservation of a right of trial by a jury to any party dissatisfied with the report; and the mode of compelling payment of the damages, which should be assessed by the commissioners or by a jury, if not voluntarily paid by the corporation within a limited period. The corporation were further authorized subsequently to make any alteration in the canal or feeders so located; and the proceedings in respect to the alterations and the damages occasioned thereby, were to be the same as upon an original location. And inasmuch as the legislature of Massachusetts had at their January session, in 1823, created a corporation, by the name of the Blackstone Canal Company, for the purpose of building and constructing a canal from the town of Worcester to the line between the states of Massachusetts and Rhode Island, and it might be convenient to unite their stocks, it was further provided (by the last section of the act), that the subscribers to the petition for the Rhode Island corporation, with the express assent in writing of the Massachusetts corporation, might authorize subscriptions to be opened for stock for the purpose of building a canal from Worcester to Providence; and that such subscribers should be deemed and taken to all intents and purposes as members of this (the Rhode Island) corporation. And that the money so raised, or raised by the sale of any future stock or shares, might be expended upon any part of said canal from Worcester to Providence, or any of its appendages. And all officers and committees chosen by said subscribers should be officers of this corporation; and all books and records kept under the authority and direction of such subscribers, and all meetings, regular or special, whether in Rhode Island or Massachusetts, should be deemed and taken to all intents and purposes to be legal proceedings by this corporation.

Amendatory acts were passed by the legislature of Rhode Island, in January, 1826, in May, 1827, and in June, 1827. By the act of January, 1826, it was provided, that the commissioners appointed under the 11th section of the former act, should be authorized,

whenever the canal together with its feeders and reservoirs should be completed, to give notice to all persons to file their claims for or on account of the detention, reservation, division, and use, by the said corporation, of the flood waters of the Moshassuck river, and of the Blackstone river, and their branches and tributary streams, and feeders; or on account of the retention, reservation, division, and use of the usual and natural run of said rivers, or of any of their branches and tributary streams or feeders, whenever the same is not wanted for the use of any mill or mills now erected, or hereafter to be erected on dams already built on said rivers, &c.; or by reason of the appropriation and use, by the corporation, of the lands of any person for boat basins or other necessary uses of the said corporation, according to the powers of the charter. And the commissioners were authorized to report the damages in such claims, and a final adjudication was to be made thereon in the manner pointed out by the act. And it was expressly provided, that so much of the former act as authorized the corporation to reserve and keep back the usual and natural run of the Blackstone river, &c., should be repealed; and that the corporation should be authorized to detain, reserve, interrupt, use, or divert any part of the usual run of said river, &c., provided they did not flow back on the wheel of any mill or any dam then built on the said river in the state of Rhode Island, only at such times when the same shall not be wanted for the use of any mill now erected or to be erected on any dam already built.

The act of May, 1827, declared that the stockholders in the Massachusetts Blackstone Canal Company should be stockholders in the Rhode Island company, as if they had originally subscribed thereto, if both corporations should before the first day of July next agree thereto; and that the books and proceedings of the original and associated stockholders should be deemed the books of both corporations. The act of June, 1827, extended the time for the Massachusetts corporation to signify its acceptance to one year from the passage of the act.

Such is the substance of the Rhode Island acts; and it was under those of June, 1823, and January, 1826, that the canal from Providence to Woonsocket dam was (as is suggested) laid out and located by the commissioners of the canal corporation; and the report thereof presented to the court of common pleas for the county of Providence at May term, 1826; and final proceedings had thereon according to the requirements of the Rhode Island acts. It might naturally be supposed, that as Woonsocket dam was within the territorial limits of Rhode Island, the authority to raise that dam would be derived from, and exercised under the acts of Rhode Island above mentioned. But this has been utterly disclaimed on the part of the defendants at the argument. On the contrary, they admit, that the state of Rhode Island possesses no legislative authority to authorize the raising of any dam locally within that state, whereby the waters of the river may be flowed back to the injury of a mill or mill privilege locally situated in Massachusetts. The court is thus spared the investigation of this delicate and important question of law, upon which it would certainly not be desirable to pass any judgment, except after the most ample discussion and investigation. Independently, however, of the admission of counsel, there would be extreme difficulty in maintaining, that there had been any valid or legal appropriation for the raising of Woonsocket dam, under the Rhode Island acts, however broad might be the authorities conferred by them. In the report made in May, 1826, and which alone, (after it was duly confirmed and acted upon,) would in law fix the location of the canal, not a syllable is to be found respecting the levels of the canal, or the raising of Woonsocket dam, or the intention to flow back the waters of the Blackstone river. Now, however ample may be the powers given by the Rhode Island acts to the canal corporation, to construct their canal, to raise dams, to form levels, and to flow back the waters of the river, those powers must be exercised in the manner pointed out by those acts, before there can be any legal appropriation or location for these purposes. Acts in pais indicating such an intention are not sufficient. They must assume a legal and permanent form. They must be reported to, and acted upon, by the proper judicial tribunals, in the manner pointed out in those acts. There being, then, no statement on the face of the report of January, 1826, that Woonsocket dam was to be raised or appropriated for that purpose, or that the waters of the Blackstone river were there to be flowed back, it is difficult to perceive, how any such appropriation can be made out arguendo, or by inference from matters and presumptions in pais. It seems to me, then, perfectly clear, that the report of May, 1826, could not justify the raising of Woonsocket dam. Indeed, the defendants manifestly so understood their own rights, in the report of August, 1827, made to the court of common pleas for Providence county; for that report expressly claims the right of raising Woonsocket dam two feet higher, for the purpose of obtaining a safe navigation in the mill-pond and river above, and obtaining a reservoir of water for the use of the canal, and requires the damages to be assessed by commissioners, which were thus sustained by the persons, owning the lands and dams specified in the report, (the plaintiffs' not being included,) viz. "all damages sustained by all other persons

than those above named, by flowage of land, to be hereafter located and appraised." It does not appear, that any application has since been made for the ascertainment of any such damages so occasioned by flowage to other persons. Indeed, the actual raising of Woonsocket dam not having taken place until August, 1828, it was indispensable for the defendants, if they meant to justify themselves, to have made report thereof according to the act of January, 1826, and to have had the damages by the flowing back of the water duly ascertained and finally liquidated. It does not appear, that they have ever so done. There is, too, a peculiarity in the act of January, 1826, which deserves notice. In the second section of the act, that part of the sixth section of the act of 1823, which authorized the canal corporation to reserve and keep back the usual and natural run of the Blackstone river, &c., is expressly repealed; and in lieu thereof authority is granted to detain, reserve, interrupt, use, or divert any part of the usual run of said river, &c., "provided they do not flow back on the wheel of any mill or any dam now built on said river in this state, &c., only at such times when the same shall not be wanted for the use of any mill or mills now erected, or hereafter to be erected on any dam already built."—An equally just solicitude might well be presumed to exist, on the part of the legislature of Rhode Island, not to allow any interference with the rights of the owners of mills or dams on the Blackstone river locally situate in Massachusetts.

These remarks have been simply to show, that the considerations growing out of them have not escaped the attention of the court. But, as has been already observed, no justification being attempted at the argument under Rhode Island acts, it is unnecessary to follow them out to their natural consequences. We may, then, turn to the Massachusetts acts of incorporation; and inquire, whether they justify the raising of Woonsocket dam, and the flowing back of the waters upon the plaintiffs' mill.—The original act of incorporation by Massachusetts, was passed in January, 1823; and it incorporated certain persons named therein, by the name of the Blackstone Canal Company, with the usual powers of bodies politic, authorizing them to construct a navigable canal, &c. &c., commencing in or near the village of Worcester, down the valley of the Blackstone river in a direction towards tide-waters, to the boundary line between the states of Rhode Island and Massachusetts. By the eighth section, the corporation were authorized, after location of the canal, or any part thereof, to report their doings to the court of sessions for Worcester county, describing the route, width, tow-paths, embankments, basins, wharves, excavations, and reservoirs, and the owners of the lands, so far as they could be ascertained. Notice thereof was to be given by the court, and commissioners were to be appointed by the court to assess the damages to the owners of the land, with a reservation of a right of trial by jury to all persons dissatisfied with the report of the commissioners, otherwise the report, upon being accepted by the court, to be conclusive. Remedy was also provided for cases of non-payment of the damages so assessed. Power was also given to alter the route or location of any part of the canal. The other provisions of the act are not material to be stated.

By an act passed on the 7th of February, 1824, the Massachusetts legislature further authorized the Massachusetts company to open books for subscriptions of stock to construct a canal from Worcester to tide-waters in the town of Providence in Rhode Island, and to create if necessary new stock for the purpose. And the new subscribers were declared to be members of the corporation, and the corporation were authorized to expend the funds raised by the new stock on any part of the canal. By an act of the 4th of March, 1826, the legislature of Massachusetts further authorized the commissioners appointed by the eighth section of the act of incorporation, "to appraise all damages accruing to any person or persons, corporation or corporations, by reason of flowing his, her, or their land by said canal company, for their use; also to appraise all damages accruing to any person or persons, corporation or corporations, by reason of the detention or diversion of any water from said person or persons, corporation or corporations, who may have a legal right to the same;" with a proviso, that the claim for damages should be filed in the court of sessions for Worcester county within one year from and after the flowing, detention, or diversion as aforesaid, otherwise they were to be barred. By an additional act, passed on the 20th day of February, 1827, it was enacted, that, after the first day of July then next, the stockholders in the Blackstone Canal Company in Rhode Island, and incorporated by that state, should be constituted stockholders in the Blackstone Canal Company created in Massachusetts, with the powers, rights, and privileges of original subscribers. Other auxiliary provisions were made; but the union of the two corporations was to take place only upon the acceptance of the provisions by each corporation under the authority of the respective legislative acts of each state. In pursuance of the legislative acts of each state, the two companies became thus united by an acceptance of the terms of those acts, the Rhode Island corporation having agreed thereto on the 25th of June, 1827, and the Massachusetts corporation on the 26th of December, 1827.

The union, then, not being complete until the last mentioned period, it follows, that all antecedent acts done must be deemed to have been done by the respective corporations under their respective and distinct acts of incorporation. This view of the matter would, therefore, exclude (if no other difficulty existed) all right to consider the acts done in virtue of the reports made to the court of common pleas of Providence county in May, 1826, and in August, 1827, as being of any validity, as acts of the Massachusetts corporation, or as done with the assent or co-operation of the latter.

Although, in virtue of these several acts, the corporations acquired a unity of interests, it by no means follows, that they ceased to exist as distinct and different corporations. Their powers, their rights, their privileges, their duties, remained distinct and several, as before, according to their respective acts of incorporation. Neither could exercise the rights, powers, or privileges conferred on the other. There was no corporate identity. Neither was merged in the other. If it were otherwise, which became merged? The acts of incorporation create no merger, and neither is pointed out as survivor or successor. We must treat the case, then, as one of distinct corporations, acting within the sphere of their respective charters for purposes of common interest, and not as a case, where all the powers of both were concentrated in one. The union was of interests and stocks, and not a surrender of personal identity or corporate existence by either corporation.

Let us see, then, how far the raising of Woonsocket dam in Rhode Island was authorized by the Massachusetts acts of incorporation. Now, the general rule certainly is, that every legislative act ought to receive a reasonable construction; and it cannot be presumed, that a legislature authorizes any act to be done in a foreign territory, when that act is beyond the reach of its proper jurisdiction or sovereignty. Every legislature, however broad may be its enactments, is supposed to confine them to cases or persons within the reach of its sovereignty. Unless, then, there is on the face of the Massachusetts acts some plain clause authorizing the raising of this dam, it cannot be implied from the ordinary language of those acts. It cannot be presumed, that the Massachusetts legislature meant to exceed its legitimate authority. The original act of incorporation in 1823, is manifestly confined to objects and purposes connected with the construction of a canal from Worcester to the Rhode Island boundary line. The raising of Woonsocket dam was not included within the scope of that canal. It was not within the termini of it. The supplementary act of February, 1824, does not change or enlarge this purpose; but only authorizes the subscription and sale of new stock to be made, and the application of these new funds to the making of any part of the canal from Worcester to tide-water in Providence. It does not authorize the corporation to construct such a canal beyond the territorial limits of Massachusetts; but only provides that any application of its new funds, for such a purpose, shall not be deemed a maladministration or malappropriation of them. The subsequent union of the two corporations in point of interest and stock does not, as has been already stated, vary this result. The only reports of locations of the canal made to the court of sessions for Worcester county, under the authority of the Massachusetts acts, are as follows: First, a report made to the court at November term, 1825, and finally acted upon, with the proceedings thereon, at September term, 1826, by which "so much of the location and report as relates to a dam to be constructed on the top of a dam now belonging to the Blackstone Manufacturing Company, across the Blackstone river in the town of Mendon, and now used by the said company," was allowed, accepted, and recorded. This report does not in the slightest degree touch any question as to raising Woonsocket dam. Secondly, a report of locations made to the court at December term, 1826, and finally, with the proceedings thereon, acted upon at March term, 1827, by which, among other things, the canal was laid out and located through the defendants' land to the boundary line between Massachusetts and Rhode Island. And here, again, no mention occurs of any raising of Woonsocket dam, or of any damages for flowage to be estimated therefor.

So that in point of fact, supposing that under the Massachusetts acts Woonsocket dam might have been located and raised, and the compensation ascertained for any flowage occasioned thereby, in the manner pointed out by those acts, (which is admitted only for the sake of argument,) no such location has been made and confirmed, and no such compensation ascertained and fixed, as these acts require to give validity thereto. There is, then, a total failure of any one execution of the proper authorities, (supposing them to exist,) to justify the raising of Woonsocket dam by the defendants, under the Massachusetts acts. In fact, that dam was not, (as has been already stated,) raised until August, 1828; and even if the union of the two corporations in December, 1827, were as complete and perfect, as the defendants contend, so as to constitute thereafter a single corporation; still, there is no legal location thereof by the corporation, confirmed by any court of Massachusetts, either before or subsequent to that period, which gives any legal validity in point of property or right to the raising of Woonsocket dam.

It appears to me, then, upon this short view of this part of the case, that the defendants have not shown any justification under

the Massachusetts acts; and they pretend to none under the Rhode Island acts. Let us see, then, whether the indenture of agreement between the plaintiffs and the defendants of the 5th of June, 1826, furnishes any justification of the defendants, or any bar to the relief sought. At the time when this agreement was entered into, the canal had been laid, and staked out by the canal commissioners, (though not finally located by any judicial acceptance thereof,) from the pond of Woonsocket dam to the Blackstone Company's dam in Mendon on the east side of the Blackstone river. The plaintiffs were at that time the owners of the land on the west side of the river from and to the same termini, they having purchased the Mowry land in the preceding February. The principal object of the negotiations, which ended in the above agreement, were, to change the contemplated route of the canal from the east to the west side of the river, so as to pass through the plaintiffs' lands between the Woonsocket dam and the Blackstone Company's dam. Accordingly, at the time of the agreement, as is apparent from the recital, the route had been changed by the canal corporation to the west side, and staked out; and the main objects apparent upon the face of the agreement are to secure to each party equivalent advantages for the change of the route, and the benefit derivable therefrom. The plaintiffs agree to exonerate the defendants from building any bridge over their land, where the canal shall pass; to build and maintain a suitable bridge at their own expense; to pay the corporation $500 towards the building of a bridge across the Blackstone Company's pond; to build a bulkhead across their trench at its junction with the canal; to hoist their gates and stop their mill for a fortnight to enable the corporation to build their bridge and guard-gates; and further, not to draw down the water more than four inches below the cap-log of their dam, so that boats in the canal may not be impeded in the navigation, except in cases of necessary repairs. And finally, they agree to release to the corporation all damages for making and continuing the canal through their land, and all damages, which may arise from the flowing of land belonging to them on the west side of the east bank of the canal, and all damages which may arise from removing earth beyond necessary excavations to make embankments for the canal in their land. In consideration of these covenants, the corporation grant to the plaintiffs, and their heirs and assigns, the right to draw and use water from the canal for any purposes, and at any points on the land of the plaintiffs, provided they do not draw and use the water, so as to remove it at their dam more than four inches below the cap-log of the same dam; the plaintiffs agreeing to build and maintain a bridge across the tow-path of the canal at each point, where

they draw the water from the canal through the tow-path thereof. Such is the substance of the indenture. And it is not a little remarkable, that though many things are minutely provided for, and especially a release of damages occasioned by flowage of the plaintiffs' land on the west side of the east bank of the canal, not the slightest allusion is made to the raising of Woonsocket dam, or to any damages to the plaintiffs consequent thereon. This omission is the more remarkable, because the plaintiffs in the preceding May had begun to dig the raceway for their cotton mill; so that the possible injury to that race-way and mill by the flowing back of the waters of the river could scarcely have escaped the observation of all the parties. It would seem almost incredible, that a very expensive mill should be about to be erected under such circumstances, without some solicitude being manifested on so important a subject. Be this as it may, it is very certain, that the indenture makes no provision on the subject of raising Woonsocket dam, or of a waiver of damages consequent thereon; and it is difficult, therefore, in a legal point of view, to perceive, what bearing it has, per se, upon the present controversy. As an agreement on another subject, it can have no legal tendency to bar or impair the plaintiffs' rights. If it is to operate as a bar, it must be from other collateral considerations; not from what it does contain; but from what it does not contain.

First, it is said by the counsel for the defendants, that, before this agreement was made, the plaintiffs had full notice of the intention of the canal corporation to raise Woonsocket dam; and that the agreement was entered into under that, as an implied term or condition of the change of the location of the canal from the east side to the west side of the river. It is said, that the canal was staked out, and its levels de facto marked out, so that they could not escape general notice; and that this notoriety is brought home to the plaintiffs. But, as has been already suggested, there is great difficulty in sustaining this position, as matter of fact. If the raising of Woonsocket dam was absolutely decided on, and fixed, in the autumn or winter of 1825; if there was then a positive location of Woonsocket dam for this purpose; how has it happened, that the report of May, 1826, makes no mention of such location? It was most material to be stated. It has been said, that the staking out of the route of the canal, and of the lands were, per se, acts of appropriation of the route and levels; and that all, that the law requires, is, that, within a reasonable time, the route and levels and locations should be reported to the proper judicial tribunal for confirmation and ulterior proceedings. But I am clearly of opinion, that though, by the staking out of the route and levels and location, an inchoate title may vest

in the corporation, if the ulterior judicial proceedings are pursued; yet, until these proceedings are had, and consummated, no complete title can vest in the corporation. They cannot take private property, or entitle themselves to do injury by flowage to the rights of third persons, until they have pursued and finished all the steps contemplated by law. Now, up to this very hour, no such ulterior proceedings have been had in respect to the flowage occasioned by the raising of Woonsocket dam. There has been no return made to any court of any location thereof, with a view to the question of damages by flowage to persons in general. It appears to me impossible, therefore, that there can have vested any title in the corporation by the mere staking out of any route, or lands. where there has been no judicial confirmation of their acts in pais, so as to bind the rights of parties in the manner contemplated. by law. Notice, then, if it were proved, of an intention to do the act, would not (as has been already stated), if the act has not acquired a legal validity, justify it. Nor am I at all prepared to admit, that a marking out of the levels of the canal would have been, even if followed up by ulterior proceedings, equivalent to a location of Woonsocket dam.

But, to recur to the fact of notice, I am not persuaded, that it has been brought home to the plaintiffs. There is, to say the least of it, so much room to doubt it, that it is incumbent on those, who assert any legal rights under it, to establish it by some testimony more stringent and pressing, than any which has, as yet, been produced to the court. In a conflict of testimony, if notice be brought into reasonable doubt, that alone would justify the court in refusing to act upon it, as an established fact.

Then, in the next place, if the fact of notice were more clear than it is, did the other ingredient exist? Did the plaintiffs understand, and by implication admit, that Woonsocket dam should be raised, so that it was assumed as a basis of the indenture of June, 1826? Unless it was so assumed, and a departure from it would now operate as a virtual fraud upon the canal corporation, I do not perceive, how the fact of notice (as has been already suggested) can conclude any thing in the case. It appears to me, that the canal corporation have not, by any proper evidence, established this most important fact. It is true, that it is asserted with great strength and directness in their answer, not only that at the time of making the indenture there was an intention to raise Woonsocket dam by. the canal corporation, but that it was then actually located and appropriated for this purpose; that the Mowry land had been purchased by their agent for the express purpose of avoiding any liability to pay damages for flowage upon that land; that the subsequent conveyance to the plaintiffs of the Mowry

land was made under an implied notice or reservation to this effect; and that the raising of Woonsocket dam was fully known and understood by all the parties as the basis, upon which that indenture proceeded. But these statements, though found in the answer, not being responsive to any allegations in the bill, but matters set up in justification, are not, per se, evidence, because they are in the answer. They must be established by proofs, aliunde; and I am of opinion, that no sufficient proofs exist in the case for this purpose. It seems, indeed, admitted, that notice would not, per se, confer any right on the corporation. But it is said, that it will deprive the party of all claim for damages done to subsequent improvements made by them after such notice. It does not appear to me, that this proposition can be maintained consistently with the principles of law. Every man has a right to use and improve his own property according to his own pleasure, without let or obstruction; and notice of an intended injurious act, if unlawful, cannot narrow this right, and exempt the party from full responsibility in damages. It is at the party's own peril, that he assumes to do any illegal act, which consequentially or directly affects the property of another. No man by giving notice of an intention to obstruct a stream, and thereby to flow back the water upon the riparian proprietors, can exempt himself from damages to the full extent of all the injury done, when the obstruction is completed.

Then, again, it has been said, that the reason for the total silence of the indenture on the subject of raising Woonsocket dam is, that it was a part of the antecedent agreement, of which there was already a part-performance by the location of the levels of the canal, and the transfer of the route to the west side; and therefore it was unnecessary to stipulate respecting it. But no such antecedent agreement is established in point of fact, of which the indenture constituted an unexecuted fragment. On the contrary, the indenture proceeds upon the admitted fact, that the canal was already staked out on the west side of the river; and the whole scope of the covenants on each side is for reciprocal benefits and advantages consequent upon that fact. The covenants do not allude to it, as the consideration for the covenants of the plaintiffs; but these covenants are "in consideration of the covenants and grants herein contained to be performed and made by the corporation." And where there have been antecedent negotiations on a subject, which have ended in a written agreement, there is no small difficulty in considering them as still a subsisting part of the agreement. Many of the mischiefs growing out of the admission of parol evidence to explain, control, or add to written instruments, would be thus immeasurably extended. If there

are any cases, in which this may be done, they are cases of a peculiar character, where fraud, or some other equivalent ingredient, is presented to the consideration of a court of equity. Nothing short of the most clear and convincing proofs would justify the engrafting of such a parol contract upon the terms of a written instrument. The very silence of the present indenture is most significant against the presumption of such a parol contract and part-performance; since the very groundwork of the argument rests on the supposition, that it was the main consideration of entering into it. There could be no part-performance, until the dam was actually located and raised; or until there was some release of all claim to future damages therefor by the plaintiffs. Until some act of this sort was done on either side, with the assent of the other, the agreement must remain executory; and its fulfilment could be absolutely secured only by incorporating it into the very substance of the indenture. If, then, the written agreement does not touch the case; if notice cannot, per se, confer any right on the corporation, or bar any claim for damages by the plaintiffs; if no parol contract, operating to bind the plaintiffs, as a matter of fraud upon the corporation, is established, we are driven back upon the acts of incorporation for a justification; and these, as has been already shown, under the circumstances, furnish none. The consequence is, that the corporation have no right to do the act; and if the raising of Woonsocket dam has been injurious to the plaintiffs, by flowing back the water, to the obstruction of their mill wheels, they are entitled to relief.

The remaining inquiry then is, whether, as matter of fact, the injury, stated in the bill, has been occasioned by the raising of Woonsocket dam. And I am of opinion, that it is so established by a strong and decisive preponderance of the evidence. I do not go over the particulars. But the result is that which has been announced. What then is the relief, to which the plaintiffs are entitled? All claims for damages in this form of proceeding are expressly abandoned by the plaintiffs, and therefore need not be made matter of discussion. The relief must be specific. The nuisance, to the extent of the injury, must be abated, and a perpetual injunction award against any future raising of the dam, or keeping up its height to the injury of the plaintiffs. For this purpose, it will be necessary to refer it to a master, to ascertain how much the dam ought to be lowered, not exceeding the two feet, in order to remove the injury to the plaintiffs; and upon his report coming in, further proceedings must be had, to give full effect to the decree of the court. An interlocutory decree for this purpose will be accordingly entered.