GRAND LODGE OF IMPROVED, BENEVOLENT AND PROTECTIVE ORDER OF ELKS OF THE WORLD v. GRAND LODGE, IMPROVED, BENEVOLENT AND PROTECTIVE ORDER OF ELKS OF THE WORLD, Inc., et al.

No. 3105.

Circuit Court of Appeals, Fourth Circuit.

June 19, 1931.

persons. It is governed by a Grand Lodge, composed of representatives elected by the various local lodges, which are bound together not only by their connection with the Grand Lodge, but also by connection with state associations, sometimes called state grand lodges, composed of the local lodges of the various states. The state associations, however, have none of the powers of government of the order, all of which are vested in the Grand Lodge. In the extension of membership, the name of the order is of great value to it, as under that name it has acquired a reputation for fraternal and charitable work which appeals to those from whom its membership is recruited.

Complainant is incorporated under the laws of New Jersey. The order has obtained charters under the laws of Ohio, New York, and the District of Columbia also. State associations of lodges, including those in Virginia, have obtained charters under the laws of various other states; but, so far as we can gather from the record, only the charters granted by New Jersey, New York, Ohio, and the District of Columbia were intended to give corporate existence to the national order. It is undoubtedly the national order which is the complainant here; and it is suing as a New Jersey corporation under the charter granted it by that state.

The individual defendants are citizens of Virginia, and the corporate defendant is a corporation organized under the laws of that state in the year 1929. It appears that at the 1929 meeting of the Grand Lodge of complainant, certain representatives from Virginia became aggrieved at action taken by the Grand Lodge and attempted to secede from the order and set up, under what is practically the same name, an independent order to offer "a harbor of refuge" to the members of the original order who were opposed to its administration. The questions presented by the appeal are (1) whether the complainant suing as a New Jersey corporation has any standing as such in this court; and (2) whether complainant has such rights in the name of the order as are entitled to protection by a court of equity against the efforts of seceding members to operate thereunder. We think that both of these questions must be answered in the affirmative.

As heretofore stated, there is no question but that the Grand Lodge representing the national order is the real party in interest in the suit. We think it equally clear that the New Jersey corporation, in whose name suit is brought, is an incorporation of the Grand

T. G. Nutter, of Charleston, W. Va., and Perry W. Howard, of Washington, D. C. (George E. C. Hayes, of Washington, D. C., and W. C. Hueston, on the brief), for appellant.

James T. Carter, of Baltimore, Md. (J. R. Pollard, of Richmond, Va., and W. W. Foreman, on the brief), for appellees.

Before PARKER, Circuit Judge, and WEBB and GLENN, District Judges.

PARKER, Circuit Judge.

This suit was instituted in the court below by the Grand Lodge of Improved Benevolent and Protective Order of Elks of the World, a New Jersey corporation, against the Grand Lodge, Improved, Benevolent and Protective Order of Elks of the World, a corporation of Virginia, and James T. Carter, Leon A. Reid, Joseph R. Pollard, and John B. Neblett, citizens of that state. The purpose of the suit was to enjoin defendants from using the corporate name of complainant. Defendants denied that the New Jersey corporation was the real party in interest, and averred that the Grand Lodge of Improved, Benevolent and Protective Order of Elks of the World, whether incorporated in New Jersey or not, had no such property in that name as was entitled to protection from use by defendants. From a decree denying the injunction prayed, dissolving a temporary restraining order and dismissing the bill, complainant has appealed.

From the pleadings and proof it appears that complainant is a colored fraternal order with lodges in various parts of the United States and a membership of some 200,000

Lodge representing the national order. A number of witnesses so testify, and it is significant that the certificate of incorporation is signed by as many citizens of New York as of New Jersey and contains the provision that the corporation shall have power to conduct and supervise subordinate lodges "throughout the United States and Canada, which lodges shall have the same powers as are herein conferred, but shall be subject to and under the control of the Grand Lodge."

The fact that the order is incorporated also in Ohio, New York, and the District of Columbia does not impair its rights under its New Jersey charter; nor does such fact limit the right of the New Jersey corporation to sue in the courts, except that, in the other states in which the Grand Lodge is incorporated, the New Jersey corporation would not be heard to invoke the jurisdiction of the federal courts on the ground of diversity of citizenship. St. Joseph & Grand Island Railroad v. Steele, 167 U. S. 659, 17 S. Ct. 925, 42 L. Ed. 315; Patch v. Wabash R. Co., 207 U. S. 277, 28 S. Ct. 80, 52 L. Ed. 204, 12 Ann. Cas. 518. The effect of incorporation in other states is merely to give the order corporate existence in those states. That the same persons may incorporate under the same name in two or more states is too well settled to admit of discussion. The corporations thus formed have legal existence, of course, only within the jurisdiction of the states which have brought them into being; but a charter obtained from one state is not forfeited by reason of the fact that a charter is obtained from another, nor is the right to resort to the federal courts, with the exception above noted, in any wise impaired. 14A C. J. 1228 et seq.; 1 Fletcher Cyc. Corporations 837; Nashua, etc., R. Co. v. Boston, etc., R. Corp., 136 U. S. 356, 375, 10 S. Ct. 1004, 1008, 34 L. Ed. 363. Familiar illustration of these principles is the practice of interstate railroads to incorporate under the laws of a number of states. 14A C. J. 1227; Patch v. Wabash R. Co., supra; Nashua, etc., R. Co. v. Boston, etc., R. Corp., supra; Memphis & Charleston R. R. Co. v. Alabama, 107 U. S. 581, 2 S. Ct. 432, 27 L. Ed. 518; Muller v. Dows, 94 U. S. 444, 24 L. Ed. 207; Chicago & N. W. Railway Co. v. Whitton, 13 Wall. 270, 20 L. Ed. 571; Baltimore, etc., R. Co. v. Harris, 12 Wall. 65, 20 L. Ed. 354; Lake Shore & M. S. Ry. Co. v. Eder (C. C. A. 6th) 174 F. 944; Boston & M. R. Co. v. Hurd (C. C. A. 1st) 108 F. 116, 56 L. R. A. 193; Farnum v. Blackstone Canal Corp., 1 Sumn. 46, 8 Fed. Cas. 1059, No. 4,675. As said by Mr. Justice Field in the NasLua Railroad Case: "There are many decisions, both of the federal and state courts, which establish the rule that, however closely two corporations of different states may unite their interests, and though even the stockholders of the one may become the stockholders of the other, and their business be conducted by the same directors, the separate identity of each as a corporation of the state by which it was created, and as a citizen of that state, is not thereby lost."

In the case of Farnum v. Blackstone Canal Corp., supra, Mr. Justice Story said: "Although, in virtue of these several acts, the corporations [one of Rhode Island and one of Massachusetts], acquired a unity of interests, it by no means follows, that they ceased to exist as distinct and different corporations. Their powers, their rights, their privileges, their duties, remained distinct and several, as before, according to their respective acts of incorporation. Neither could exercise the rights, powers, or privileges conferred on the other. There was no corporate identity. Neither was merged in the other. If it were otherwise, which became merged? The acts of incorporation create no merger, and neither is pointed out as survivor or successor. We must treat the case, then, as one of distinct corporations, acting within the sphere of their respective charters for purposes of common interest, and not as a case where all the powers of both were concentrated in one. The union was of interests and stocks, and not a surrender of personal identity or corporate existence by either corporation."

Coming to the merits, it is well established that a benevolent, fraternal, or social organization will be protected in the use of its name by injunction restraining another organization from using the same or another name so similar as to be misleading. Nims on Unfair Competition and Trademarks (3d Ed.) § 86; Thompson on Corporations (3d Ed.) § 77; Benevolent & Protective Order of Elks v. Improved Benevolent & Protective Order of Elks of the World, 205 N. Y. 459, 98 N. E. 756, Ann. Cas. 1913E, 639, L. R. A. 1915B, 1074 and note; Grand Lodge, K. P. v. Grand Lodge, K. P., 174 Ala. 395, 56 So. 963; Society of War of 1812 v. Society of War of 1812, 46 App. Div. 568, 62 N. Y. S. 355; National Circle, Daughters of Isabella, v. National Order of Daughters of Isabella (C. C. A. 2d) 270 F. 723; Daughters of Isabella No. 1 v. National Order, Daughters of Isabella, 83 Conn. 679, 78 A. 333, Ann. Cas. 1912A, 822; International

Committee of Young Women's Christian Associations v. Young Women's Christian Association, 194 Ill. 194, 62 N. E. 551, 552, 56 L. R. A. 888; Benevolent & Protective Order of Elks v. Improved Benevolent & Protective Order of Elks, 122 Tenn. 141, 118 S. W. 389; Creswill v. Grand Lodge Knights of Pythias, 133 Ga. 837, 67 S. E. 188, 134 Am. St. Rep. 231, 18 Ann. Cas. 453, reversed on other grounds 225 U. S. 246, 32 S. Ct. ¥22, 56 L. Ed. 1074. The reasons underlying the rule are thus stated in Nims on Unfair Competition and Trademarks (3d Ed.) § 86: "The fact that a corporation is an eleemosynary or charitable one and has no goods to sell, and does not make money, does not take it out of the protection of the law of unfair competition. Distinct identity is just as important to such a company, oftentimes, as it is to a commercial company. Its financial credit—its ability to raise funds, its general reputation, the credit of those managing it and supporting it, are all at stake if its name is filched away by some other organization, and the two become confused in the minds of the public."

And the rule is thus stated in Thompson on Corporations (3d Ed.) § 77: *"Use of Name Protected by Injunction.*—The rule is that a corporation is protected in the selection and adoption of its name in the same manner and to the same extent as a corporation, unincorporated society, or individual who has acquired a prior right to a name used as a trade-name or trade-mark. Any subsequent appropriation and use of the name, or a similar name, of an existing corporation by another corporation, where it does substantial damage or where it is calculated to mislead the public, will be restrained. This is the rule though the corporation is not formed for pecuniary profit, but for purely fraternal, benevolent, or religious purposes. The rule has also been stated thus: 'The principles upon which these cases rest are, that although a corporation may be legally created, it can no more use its corporate name in violation of the rights of others than the individual can use his name, legally acquired, so as to mislead the public and to injure another. The principle adopted is similar to that of a trade-name or trade-mark, and is applied accordingly. Consequently a court of equity has jurisdiction in such a case without the intervention of the state.' "

The case of International Committee of Young Women's Christian Associations v. Young Women's Christian Association of Chicago, supra, is very similar to the case here, and the same principles are applicable. In that case the appellants had withdrawn from the Young Women's Christian Association because of the failure of the association at one of its conferences to adopt a certain "evangelical test," and, under the name of International Committee of Young Women's Christian Associations, had engaged in the general work in which the original association was engaged. In holding that the use of the name should be enjoined, the Supreme Court of Illinois said: "It is apparent the motive for the creation of the International Committee was brought about by the failure of the International Conference to adopt the resolution requiring the 'Evangelical test.' That those persons who favored the adoption of such a resolution had a right to withdraw from the International Conference when convinced that their views were not agreeable to the majority of the conference, and to call a convention of those who were favorable to their views, and to select a committee or board of managers to have general supervision over the work of the associations comprising that convention, is not denied, and must be conceded by all. The question here, however, to be decided is, Had such persons, upon their withdrawal and reorganization, a right to adopt as a name for its managing board 'International Committee of the Young Women's Christian Associations,'—a name which contains substantially the entire corporate name of appellee, a previously incorporated association, preceded by the words 'International Committee of,' which clearly indicate to the ordinary mind that appellant is a committee of appellee and the conference with which appellee is affiliated, and with which appellant has no connection, and to use that name in the conduct of its affairs? We think not. The object, work, sources of support, and field of labor of each being substantially the same, and the name of appellee having been adopted and in use by it many years prior to the incorporation of the appellant, the appellant had no right to adopt as its corporate name one so similar to that of appellee, or to incorporate in its name words which would indicate to the public that it was the representative of appellee and the conference with which appellee is affiliated. In addition to the similarity of name, and the representation contained in appellant's name that appellant is the representative of appellee and the conference with which it is affiliated, from an examination of the entire record it clearly appears that such name was

adopted by the appellant advisedly and for the purpose of leading the general public, and the persons with whom it was likely to be associated, and from whom it hoped and expected to obtain support by way of donations, to believe that it stood as the committee and representative of the associations known as 'The Young Women's Christian Association,' then organized in the field where it expected to operate. Appellant may have felt justified in so doing by reason of the failure of the International Conference to adopt the 'Evangelical test,' yet such conduct, in law, amounts to a fraud upon the public and appellee."

■ In the case at bar, complainant for more than a quarter of a century had enjoyed the use of its name and had built up thereunder a large fraternal order among the colored people of the United States. Its fraternal, charitable, and educational activities had commended it to the public, and had given membership therein a value to the people from whom it recruited its membership. It was entitled to enjoy the fruits of the organization which it had built up, unhampered by the efforts of others to appropriate to themselves its corporate name with the advantages thereto attaching. If the Virginia members were dissatisfied, they, of course, had a right to withdraw and organize a new order; but they had no right, if they did so, to adopt the name of the original order or to hold themselves out as a branch of that order. To do so constitutes a fraud upon the original order and upon the public, and, if allowed, would result in enabling the rival organization to appropriate to itself the advantages which the original order had built up through years of effort. A more glaring example of unfair competition could not well be imagined.

Defendants rely upon the case of Supreme Lodge, Knights of Pythias v. Improved Order, Knights of Pythias, 113 Mich. 133, 71 N. W. 470, 471, 38 L. R. A. 658. In that case, however, as the court pointed out, there was a difference in the names used which the court thought would avoid imposition upon the public or interference with the rights of plaintiff order. That is not the case here, where the names are practically identical. While the soundness of the decision in that case is questionable, the court in its opinion laid down principles which we regard as sound and which condemn the use by defendants of the name which they have adopted. The court said: "The correct principle is stated in complainant's brief (page

71) as a quotation from the opinion of Judge Foster, of the superior court of Vanderburgh county, Indiana, rendered in the suit of St. George Lodge, K. of P. v. Rosenthal: 'Where a corporation has appropriated and used a name for such length of time as to become identified by the name, and had established a character and reputation under it, it is a fraud upon the corporation and the public if this name be assumed by others under such circumstances as would lead the public to believe that they constitute the original corporation, and, where injury will result to the corporation on account thereof courts of equity will, at the suit of the injured parties, by injunction restrain the further perpetration of the wrong. It is the special injury to the party aggrieved and the imposition upon the public that constitute the wrong which the courts will redress. It is not necessary that the wrong should be intentionally committed. It is enough that the name should be used under such circumstances as would lead the public to believe that the latter organization was the former, and thereby cause injury to the former corporation.' "

■ It is argued that complainant has abandoned the right to be protected in the use of its name by allowing the use of same by various organizations of colored Elks in different parts of the country. We do not think, however, that this position can be sustained upon the record. It is true that charters were obtained from various states by the Elks resident therein and that these charters were obtained with the approval of the Grand Lodge; but it appears that these were but the incorporation of the lodges within the respective states which at all times remained subordinate to the Grand Lodge. There was a schism in the order about 1900, but this was healed a few years later, and since then all colored Elks of the United States, the evidence shows, have recognized the jurisdiction of the Grand Lodge and have exercised their rights as such under its dispensation.

■■ Finally it is said that complainant is not entitled to the protection of its name because it has itself appropriated the name of the white Benevolent and Protective Order of Elks. Benevolent & Protective Order of Elks v. Improved Benevolent & Protective Order of Elks of the World, 205 N. Y. 459, 98 N. E. 756, L. R. A. 1915B, 1074, Ann. Cas. 1913E, 639; Id., 122 Tenn. 141, 118 S. W. 389. In this connection it should be said that complainant claims not to have been a party to the Tennessee case, and that the injunction granted in the New York case has been dis-

solved by consent. But, without passing upon the rights of the white order, which are not before us, we do not think that the rights of the complainant are to be ignored because it has adopted a name very similar to that of the white order. Neither complainant nor defendants are seeking membership among white people, and the similarity of their names to that of the white order has no bearing upon the injury and wrong which the use of the name by defendant will inflict upon complainant. The white order recruits its membership from white persons only, and does not enter into competition with either complainant or defendants. Defendants, however, are in direct competition with complainant, and the use of its name gives defendants an unfair and unconscionable advantage. As said in Re Polish Nat. Catholic Church, 31 Pa. Super. Ct. 87, the confusion likely to follow from the use of similar names is the reason for denying the right to such use, rather than the existence of any vested right in the organization objecting to the use of the name. And in considering the probability of confusion liable to result from the use of similar names, the court will take into consideration the persons with whom the organizations deal which use the names in question. Legal Aid Soc. v. Co-operative Legal Aid Society, 41 Misc. Rep. 127, 83 N. Y. S. 926. The rule is thus stated in Nims on Unfair Competition (3d Ed.) 962:

"To establish a cause of action for unfair competition it is not necessary to prove an exclusive right in plaintiff, i. e., that no one else ever has used the mark in the past or that no one else is using it now.

"The issue is not one of title or exclusive right but of representation, viz., what does the mark as used by plaintiff represent or mean to the public, and what in contrast, does the mark used by the defendant represent."

In Clark Thread Co. v. Armitage (C. C. A. 2d) 74 F. 936, 943, Judge Shipman said, in sustaining an injunction issued to restrain the use of certain names and labels on the ground of unfair competition: "It does not follow, however, because the complainant is not exclusively entitled to use the words 'Clark's Spool Cotton,' that therefore it cannot rightfully enjoin a person who is fraudulently making use of its label. The litigation in regard to the Rogers trade-mark * * * showed that three distinct corporations were entitled to use the name 'Rogers' upon their goods, but it was never supposed by a court that either injured owner had not a right to suppress the use of the trade-name by a fraudulent competitor, or that it was an adequate defense that there were other owners whose use was not fraudulent."

And see, also, Red Polled Cattle Club of America v. Red Polled Cattle Club of America, 108 Iowa, 105, 78 N. W. 803; British-American Tobacco Co., Ltd., v. British-American Tobacco Co. (C. C. A. 2d) 211 F. 933, Ann. Cas. 1915B, 363; Philadelphia Trust, S. D. & I. Co. v. Philadelphia Trust Co. (C. C.) 123 F. 534; Hendriks v. Montagu, L. R. 17 Ch. Div. 638; Lee v. Haley, L. R. 5 Ch. App. Cas. 154. In the case last cited, Lord Justice Giffard thus stated the rule which we think applicable here: "I quite agree that they have no property in the name, but the principle upon which the cases on this subject proceed is, not that there is property in the word, but that it is a fraud on a person who has established a trade, and carries it on under a given name, that some other person shall assume the same name, or the same name with a slight alteration, in such a way as to induce persons to deal with him in the belief that they are dealing with the person who has given a reputation to the name."

The case before us comes to this: Complainant, under a name very similar to that of a white fraternal order, has built up a fraternal order among colored people, which has acquired a large membership and a splendid reputation among the people from whom it solicits members. The individual defendants have withdrawn from the order and by the use of its name seek to secure for the new order which they have incorporated the benefit of its reputation and standing. This we think is a fraud upon the original order and upon the public, which a court of equity should enjoin. The decree of the court below denying the injunction and dismissing the bill will accordingly be reversed, and the case will be remanded for further proceedings not inconsistent herewith.

Reversed.