# SUPREME JUDICIAL COURT

FOR THE

## COUNTY OF WORCESTER, OCTOBER TERM 1849, AT WORCESTER.

PRESENT:

Hon. LEMUEL SHAW, Chief Justice.
Hon. SAMUEL S. WILDE,
Hon. THERON METCALF, } Justices.
Hon. RICHARD FLETCHER,

---

## Paul C. Chase vs. The Sutton Manufacturing Company

Where the land of an individual is taken, under the authority of the legislature, for a public use, and a full compensation is paid to the proprietor for a perpetual ease- ment therein; and the same land is afterwards appropriated, by legislative au- thority, to another public use of a like kind; the owner of the land is not entitled to any further compensation.

The Blackstone Canal Company were incorporated by an act of the legislature, for an unlimited period, with authority to locate and construct a canal down the val- ley of the Blackstone river, from Worcester to the state line, and, for that purpose, to appropriate the ponds on or near the route of the canal as reservoirs, paying all damages occasioned by the construction of such canal or reservoirs, or by flowing resulting therefrom, to be estimated and adjusted in the manner provided in the act of incorporation, and with authority also to erect mills and other works on the waters connected with the canal: In locating the canal, they established as a reservoir and a part of the canal a pond raised by the respondents for the use of their mill by erecting a dam across the Blackstone river: The complainant, whose

land was flowed by the dam, and who had not previously demanded or been paid any damages therefor, after such location, presented his claim for damages against the canal company, and was allowed and received a certain sum in gross, for the flowing of his land, which was declared to be perpetual: The canal company were afterwards authorized by the legislature to sell and convey their entire property, or any part of it, in the canal, for the purpose of a railroad from Worcester to Providence; such conveyance to vest a good title in the purchaser, though a change of the use of the canal to other public purposes might follow; and not to work a forfeiture of any of the vested rights of the company to the dams located to maintain a head of water, though the canal might be discontinued as a public navigable highway: The act also provided, that the dams erected in the bed of the Blackstone river might be maintained by the several mill owners, for their exclusive benefit, at the same height to which they had been raised; and that such land as should not be so sold should revert to the original owners divested of the easement: The canal company accordingly made a sale and conveyance, of all their property in the canal and its appendages in Massachusetts, to the Worcester and Providence Railroad Company, for the purposes of a railroad; reserving to themselves all the reservoirs, the dams erected on the Blackstone river, and the waters therein; and saving the right and privilege of all persons to draw or conduct water through the canal for mill purposes, irrigation, or otherwise: The Blackstone canal, — so far as the same was within this commonwealth, — from the time of such conveyance, was discontinued as a navigable canal, although portions of it remained susceptible of such use, and had been principally filled up by the railroad company, or by the original proprietors: In a complaint for the flowing of the complainant's land by the respondents' dam and pond, subsequently instituted, it was held: (1.) That the canal company, by establishing the respondents' dam and pond as a reservoir, and the latter as a section of their canal, and paying the damages therefor, acquired the same right as if they had themselves built the dam and formed the reservoir; (2.) That the canal company, having the right to erect and maintain mills, had a right to adopt the respondents' dam and pond, as well for that purpose, as for the supply of the canal with water; and having adopted the same, and given public notice thereof, the complainant's claim for damages embraced all the damages done to his land by flowing, for all the uses to which the company had a right to apply the water; (3.) That the legislature might authorize the canal company to sell the property of the canal, and 'o discontinue the same, retaining their corporate existence and powers, in other respects; and, (4.) That the complainant, having claimed and received of the canal company a gross sum in damages for the right of flowing his land, as a perpetual easement, for purposes of a public or *quasi* public nature, the same thereby became annexed to the mill privilege, free from all further claim for damages occasioned by such flowing.

THIS was a complaint against the respondents for flowing land, which came to this court by appeal from the court of common pleas, where it was submitted upon an agreed statement of facts.

The complainant is the owner of the land described in his complaint, and the same is flowed, as therein alleged, by the respondents' dam.

In 1823, the legislature of this commonwealth passed an

act (*St.* 1822, *c.* 27) incorporating the Blackstone Canal company, without limitation of duration, for the purpose of constructing a canal from Worcester to the line of the state of Rhode Island; and, in the same year, the general assembly of Rhode Island passed an act incorporating the Blackstone Canal company, in that state, for the purpose of constructing a canal from Providence to connect with the canal authorized by the state of Massachusetts. These two canal companies, though never amalgamated, were associated in the manner mentioned in their respective charters, and in sundry acts subsequently passed in addition thereto; and canals were constructed accordingly, which were connected together at the boundary of the two states, and formed one continuous line of canal from Worcester in this state to Providence in Rhode Island.

The second section of the act above mentioned, to incorporate the Blackstone Canal company, in this state, authorized the corporation thereby established to locate, construct, and fully complete a navigable canal, with locks, tow paths, basins, wharves, dams, embankments, toll-houses, and other necessary appendages, commencing in or near the village of Worcester, and from thence down the valley of the Blackstone river, in a direction toward tide water, in such place or places, as might be deemed most convenient for said company, to the boundary line between the states of Massachusetts and Rhode Island; with further power to employ and use, as reservoirs for the purpose of supplying with water the canal, or such works as might have any portion of their waters diverted from them to supply the canal, North pond, Quinsigamond or Long pond, and Dorety pond, with such other ponds as lie upon or near the route, and also to save the flood and other waters in said ponds, and to construct artificial reservoirs for the purposes aforesaid; and to connect with the canal, by feeders, or by navigable canals, any or all such ponds and reservoirs; provided, however, that all damages, which might be occasioned to any person or persons, by any of said canals, reservoirs, or feeders, in the construction thereof, snould be satisfied by the corporation, in the manner provided in the act

The fourth section authorized the corporation to purchase and hold real estate, not exceeding the value of three hundred thousand dollars, and to erect mills and other works on the waters connected with the canal, feeders, and reservoirs.

The eighth section provided, that when the canal company should have located their canal or any part thereof, they should report the same to the court of sessions, by whom commissioners should thereupon be appointed to estimate all damages which any person or persons, whose lands should be described and mentioned in such report, might sustain. And the commissioners were required to give public and seasonable notice, in such manner as the court should direct, to all persons interested, to file their claims, either with some one of the commissioners, or with the clerk of the courts for the county of Worcester, within thirty days from the date of the notice. At the end of the term allowed for filing claims for damages, the commissioners, having previously given notice, in the manner provided in the act, to all parties interested, of the time, and of the extent of the route to be examined, were to pass over the premises, and, after hearing the parties in interest, to estimate all such damages as they should think any person would sustain by the opening of the canal, or any of its branches or feeders, through the land of such person, or by the construction of any reservoirs, embankments, tow paths, basins, wharves, or any other appendages, over and above the advantages accruing from the opening of the canal. If any person should be dissatisfied with the estimate of the commissioners, he might have his claim for damages revised and assessed by a jury, in the manner provided by law, in the case of a complaint for damages occasioned by the laying out of a highway.

By a statute subsequently passed (*St.* 1825, *c.* 144) in addition to the former act, it was provided, that the commissioners, appointed under the eighth section of that act, should be authorized to appraise all damages accruing from the flowing of land by the canal company, for their use, and also damages occasioned by the detention or diversion of any water from persons having a legal right to the same.

In 1825, after the canal company had been incorporated, but before they had located their canal, David Wilkinson and company, who were then the owners of real estate on the bank of the Blackstone river, erected a mill thereon, together with the dam in question, which was built across the river, and the pond raised by which, known as Pleasant Falls pond, occupied and was a part of the bed of the river. The respondents subsequently became the purchasers from Wilkinson and company, and are now the owners of the mill erected by them, and of the mill privilege and dam connected therewith.

In 1828, the canal company located and established the dam erected as above mentioned by Wilkinson and company, and the pond thereby raised, as a reservoir, and made use of the pond, by the side of which they had formed a tow path, for a mile or more, as a part of the canal, and reported these locations to the court of sessions, as they were required to do by their act of incorporation.

In the same year, the complainant, not having before claimed, either against the respondents or their predecessors, or been paid, any damages for the flowing of his land occasioned by the respondents' dam, prosecuted his claim for the damages done or to be done him by the canal company, in consequence of their having flowed his land, by means of the respondents' dam and pond, before commissioners appointed for the purpose, in the manner provided by the statute, who reported, that the land around the respondents' pond, which was and would be "permanently overflowed," by keeping up the dam to its then present height, was owned in severalty, among others, by the complainant, to whom they awarded the sum of $225 "for his permanent damages," and $13·50 for damages in 1827, making in the whole $238·50 to be paid by the canal compa.iy. On an appeal from the award of the commissioners, the jury, on the hearing before them, estimated the damages which the complainant had sustained, or should sustain, by locating the respondents' pond as a reservoir for the use of the canal, including all flowing, which was to be perpetual, at the sum

of $480; and this amount was duly paid by the canal company.

The canal company continued to use the rights, privileges and easements thus acquired, until the year 1846; and the respondents have continued to exercise the right to draw and use the water of the pond for their mill, subject to the rights and easements of the canal company, to the present time.

In the year 1844, the legislature of Massachusetts passed an act (*St.* 1844, *c.* 166) in addition to their act of incorporation, authorizing the canal company to make sale of the whole or of any portion of their property.

By the first section of this act, the canal company were authorized, in order to facilitate the construction of a railroad between Worcester and Providence, as a substitute for the canal, to make sale of their entire property, or any part or portion thereof, and to convey the same to any purchaser or purchasers; which conveyance should vest a good and sufficient title to such property, " though a change of the use to other public purposes " might follow such sale.

The second section declared, that such sale of the canal, or any part or portion of the works thereof, should not work a forfeiture of any of the vested rights of the company to the dams located to maintain a head of water, but that the right to maintain the same should continue in the company, and their assigns, the same as before, though the canal might be discontinued as a navigable highway.

The third section provided, that the dams which had been either erected or raised by the canal company in the bed of the Blackstone river, might be maintained by the several mill owners, who had an interest in the works on said dams, at the same height to which they had been raised by the company, and for the exclusive benefit of such mill owners, their heirs or assigns; that the land over which the canal had been located should not be sold and conveyed for any other than railroad purposes; and that such land as should not be sold for railroad purposes should revert to the original owners thereof, divested of the easement of the canal company.

In pursuance of the authority conferred by this act, the canal company passed a vote to sell and convey certain portions of their property; and, on the 4th of February, 1846, made a conveyance accordingly to the Providence and Worcester Railroad company, for their use and benefit as a railroad company, and for railroad purposes, of so much of the grantors' right, title, interest and property in that part of the canal which was within the state of Massachusetts, comprising the entire body, tract, bed and bottom, or right of way thereof, with the tow paths, locks, lock-houses and other fixtures, as the railroad company, the grantees, should actually appropriate and use in the construction of their road, or for railroad purposes.

The deed provided, that so much of the canal as should not be used and appropriated in the construction of the railroad, or for railroad purposes, should remain the property of the grantors, except so far as the same might revert to the original owners of the land by operation of law; the reservoirs owned by the grantors in Massachusetts, with the land and dams belonging thereto, the waters contained therein, the dams erected or raised on the Blackstone river by the grantors, and the waters in the river retained by such dams, were expressly reserved by the grantors to themselves, without being affected in any way by the conveyance; and the deed further provided that the rights and privileges, which any person or persons had acquired or then possessed, to draw or conduct water through the canal in Massachusetts, for mill purposes, irrigation, or otherwise, should not be injured or affected by the conveyance; but that such rights and privileges should be and remain uninjured, and in full force.

The Blackstone canal in Rhode Island has never been discontinued, but is used occasionally as and for a canal.

The respondents' pond, with the tow path by the side of it, is in the same condition in which it has always been, and boats may still be towed upon it for the distance of a mile or more; but the same has never been used as a canal, since the date of the deed to the Providence and Worcester Rail-

oad company; and the canal, for the greater part of the way above and below the respondents' pond, so far as the same is in this state, has been filled up by the railroad company, or by the original owners of the land.

There are several other portions of the line of the canal in Massachusetts, where dams and feeders constituted the level of the canal, through which boats can still be towed; though the same have never been used for the purpose of navigation, by the canal company, since the year 1846; but without the respondents' pond and others in Massachusetts, the canal in Rhode Island could not be used at all seasons of the year.

The canal company have made no other conveyance of their property or rights than as above mentioned. No forfeiture of their charter has ever been judicially ascertained or declared; nor has the same been repealed; nor have they surrendered their franchise. They have never given the respondents any notice, that they were at liberty to take down their dam, if they should think proper to do so; but the canal company still claim to be the owners of all the property not conveyed by them to the railroad corporation.

It was further agreed, that the respondents and those under whom they claim had acquired no right to flow the complainant's land, without paying damages therefor, unless such a right resulted from the location of the canal, and the assessment and payment of damages therefor under the act incorporating the canal company; that, since the conveyance to the railroad company, the respondents had and the canal company had not repaired the respondents' dam; and that the canal had become nearly worthless, and not of much public benefit.

The case was argued at the October term, 1848.

*B. R. Curtis*, for the petitioner.

I. Is the right of the canal company to flow these lands now in existence? 1. The grant to them, in their charter, was not general, but merely for the purposes of working a navigable canal. Their only right to raise a head of water was for the use of the canal. Any right may be destroyed by an act incompatible with the nature and exercise of that

right. *Taylor* v. *Hampton,* 4 McCord, 96, 103; *Manning* v *Smith,* 6 Conn. 289; *Pritchard* v. *Atkinson,* 4 N. H. 1; Gale & Wh. Easem. 258, 354, *et seq.,* and English cases there cited; Woolr. Ways, 15. Here the change of the use was important to the land owners. See *Biglow* v. *Battle,* 15 Mass. 313; *Strong* v. *Benedict,* 5 Conn. 210; *Saunders* v. *Newman,* 1 B. & Ald. 258; *Luttrel's Case,* 4 Co. 86. If the grant is general, the use may be changed; otherwise not. *French* v. *Braintree Man. Co.* 23 Pick. 216. The fourth section of the charter is subservient to the second, and only means that the company may use the surplus water in driving mills. The construction of this act is to be fair; not strict, but still not loose nor too liberal. 4 Kent, 298, 299; *Hooker* v. *New Haven & Northampton Co.* 15 Conn. 312; *Stourbridge Canal Co.* v. *Wheeley,* 2 B. & Ad. 792; *Chesapeake & Ohio Canal Co.* v. *Baltimore & Ohio Railroad Co.* 4 Gill & J. 1, 175. 2. By the act of 1844, *c.* 166, the existence of the canal as a navigable canal was terminated, not temporarily, but permanently, and by the act of the parties. The language of the second section of that act does not import a change of the uses of the easement, and a conferring of new rights, but only a waiver of the right of the state to a forfeiture. Besides, no provision being made for compensation, it would be unconstitutional if it conferred new rights. The analogous acts, discontinuing turnpikes and establishing highways, provide in all cases for compensation. See *St.* 1827, *c.* 77, § 14, reënacted in Rev. Sts. *c.* 39, § 17. The third section of the act of 1844 does not mean, that the mill owners shall maintain their mills without making compensation to the owners of the land flowed. The damages already paid are for the use of the land for the canal only, and were estimated accordingly.

II. The respondents cannot claim and exercise the right of flowing under the canal company. This dam was not " either erected or raised " by the canal company, within *St.* 1844, *c.* 166, § 3, but was erected many years before.

· *P. C. Bacon* and *I. M. Barton,* for the respondents.

SHAW, C. J. This is a complaint against the respondents

under the mill acts, (Rev. Sts. c. 116,) to obtain compensation for damage occasioned by flowing the land of the complainant, by a dam erected and maintained for mill purposes. The case comes before this court by appeal, upon an agreed statement of facts.

It appears by the case, that the dam complained of, now owned by the respondents, was built upon and across the bed of the Blackstone river, by Wilkinson and company, in the year 1825, under whom the respondents have derived title. Before the erection of this dam, a company had been incorporated by the legislature of Massachusetts, to establish and maintain a navigable canal, from Worcester, along the valley of the Blackstone river, and on a line towards tide water at Providence, to the line of the state of Rhode Island. A similar company was incorporated in the year 1823, by an act of the state of Rhode Island, to construct and maintain a similar canal, from the Massachusetts line to Providence, both together being intended to meet at the state line, and together to provide canal navigation from Worcester to Providence.

The dam of Wilkinson and company, now that of the respondents, was built after authority was granted to lay out the canal, but before it was located; the water thus raised, constituting the mill dam of Wilkinson and company, then flowed the same lands now owned by the complainant, and in respect to which this claim for damages is made, and to the same height to which it is now flowed.

But before proceedings were had, for the assessment of damages, in behalf of the present complainant, or at least before any such damages were assessed, the canal company in Massachusetts located their canal, as they had authority to do, over and along the mill pond, to the extent of a mile or more, constructed a towing path along the margin of the same, and established the dam and pond as a reservoir. After such location of the canal and establishment of the reservoir, namely, in the year 1828, the complainant caused his damages, done or to be done him by the canal company, occasioned by the respondents' dam, upon

14 *

proper proceedings in the courts, according to the provisions of the act of incorporation, to be assessed, first by commissioners, and ultimately by a jury; and the damages so assessed were duly paid to him by the canal company.

The original act had provided for a compensation in damages, for those whose lands should be taken for these works; but it might be considered doubtful, whether such provision for compensation extended specifically to damage done by flowing. This doubt was removed by an act passed before these proceedings took place, (*St.* 1825, *c.* 144,) by which the commissioners were expressly authorized to appraise all damages accruing to any person by reason of flowing his land by the company, for their use. No question is made, that these damages were rightly awarded. It further appears, that no other damages have been paid to the complainant, by the respondents, or by any owner of their mill, mill dam and privilege, for damages caused by flowing by means of the same dam.

It further appears, that by virtue of authority given to the Blackstone Canal company, by the statute of 1844, *c.* 166, they have sold and conveyed to the Providence and Worcester Railroad company the land occupied by their canal, locks, toll-houses, and embankments, lying in Massachusetts, reserving, however, their reservoirs, dams, and waterworks; that since the sale, sections of the bed of the canal have been filled up, both above and below the dam in question, and that the part of the canal lying in Massachusetts has ceased to be used as a navigable canal, though the lower section thereof, lying in Rhode Island, between the Massachusetts line and tide water at Providence, is still used as a canal.

I. The complainant now claims damages on the ground, that he has been paid by the canal company only for the use of his land as a reservoir, for the purposes of supplying the canal with water, for the use of it as a navigable canal; that it is no longer necessary and no longer used for that purpose; that he has a right, as against the canal company, to have the dam of the respondents removed, and the water to flow off freely from his land; and that if the respondents want it to

raise a head of water for their mill, they must pay him damage therefor, as if he had received no compensation from the canal company for the damage occasioned by them, although from the same cause and by means of the same dam.

If the transaction were the plain and simple one, which the argument seems to imply; if there were no identity or communion of right and interest between the mill owners and the canal company; if the company had been authorized to take and use water, and erect dams and waterworks, for the purpose only of constructing a navigable canal and keeping it in operation; if that object and purpose had been abandoned, and the actual use of the water had been discontinued by the company, without any reservation or saving of rights; — there would have been much plausibility in this argument, although the result would be to give the plaintiff a double compensation for one and the same loss.

It becomes, therefore, necessary to inquire what were the objects and purposes, and what, by law, were the powers and privileges, of the canal company; what was the connection between them and the mill owners; and by what authority, and under what circumstances, the use of the canal was discontinued, as a navigable canal.

By the act of incorporation passed on the 14th of January, 1823, (St. 1822, c. 27,) the company were incorporated, and authorized to locate, construct, and complete a navigable canal, with locks, tow paths, basins, wharves, dams, embankments, toll-houses, and other necessary appendages, commencing, &c., down the valley of the Blackstone river, with power to use and employ, as reservoirs, certain ponds named, with such other ponds as lie upon or near said route, and to construct artificial reservoirs for these purposes, with a provision for the payment of damages occasioned thereby. The fourth section, after providing for and limiting the right of the company to hold real estate, further gives them power to erect mills and other works on the waters connected with the canal, feeders and reservoirs. Several additional acts were passed, the object of which was to establish a more complete union of purposes and interests between the Rhode Island

company and the Massachusetts company, no otherwise material to this inquiry, than as they indicate the sense of the legislature and the company, that the two together were deemed parts of one great public enterprise, not, however, abolishing the identity of either, or uniting them into one corporation. *Farnam* v. *Blackstone Canal Co.* 1 Sumn. 46.

Under the authority thus given to erect dams, tow paths, reservoirs and the like, paying damages to the owners of land used for that purpose, the canal company established the dam and mill pond in question, then newly erected, as a reservoir, and adopted it as a section of their canal, with a tow path on the side of it, for more than a mile. This they could only do, by purchase of Wilkinson and company, or by payment of damages to them, by which, and by force of the statute, they acquired a right in the dam and reservoir, in the same manner as if they had built the dam and formed the reservoir at their own charge. They paid the damage occasioned thereby, as they would have done, had it been commenced after the location. The dam was erected across the bed of the Blackstone river, and directly within the limits where the company were authorized to make and perpetually maintain a reservoir.

The complainant himself seems so to have regarded the case, by forbearing to make any claim for damage against Wilkinson and company, as mill owners and builders of the dam, and claiming gross damages, as for a perpetual easement to flow his lands, of the canal company, and receiving the full amount of such damages, as assessed by a jury.

By the fourth section of the act of incorporation, the canal company were authorized to erect mills and other works on the waters connected with the canal, feeders and reservoirs. It has been argued, that this power of erecting and maintaining mills was not a separate and independent purpose from that of erecting and maintaining a navigable canal, nor was it a separate and independent franchise conferred by the act, but only incidental to the power of raising water for the canal, and would fall with it. Perhaps, if there were no reservation in the act, by which the company were authorized to

discontinue the navigable canal, this latter consequence would follow, and the franchise of erecting and maintaining mills alone would cease with it. But this power is alluded to now for another purpose. The dam and reservoir in question, if not absolutely necessary, were obviously well adapted to promote the principal enterprise, as a navigable canal; they would also be useful for mill purposes, when there should be water enough for both, and though merely incidental, the right to maintain a mill would clearly be within the franchise conferred on the company. This incidental right to use the water for mill purposes was, no doubt, conferred on the company as a benefit, to encourage them thus in carrying on a great public enterprise; and there was a semblance of equity in it, because it was a valuable power in the nature of property, created at their expense, and by the outlay of their capital, though in the promotion of another object. The company having this valuable privilege might either use it themselves, or sell or lease it to others, and thus make it a source of revenue, in aid of the principal purpose.

In the present case, the company having acquired this dam, and adopted it for the purpose both of making a section of the canal and also of establishing it as a reservoir, obtained with it the right to the mill power, as incidental, which they could use or dispose of, for a certain term of time or in perpetuity. If they made arrangements with the proprietors, by which the company were to pay the damages occasioned by the dam or for the cost of the dam itself, to have the use of the pond, for a section of the canal, with a tow path on its margin, and also for a reservoir, and the proprietors to have the mill power and mill privilege, these respective rights, mutually conceded, must be regarded as considerations for each other, and the mill privilege to be held in subordination to the right of the company, and no longer upon an independent title. Otherwise, the dam and reservoir could not be " established" as works erected and maintained in pursuance of the powers vested in the company by the act, and the mill owners might prostrate the dam at their pleasure. This is wholly inconsistent with the facts agreed, to wit, that

the company did adopt the dam as theirs, paid the damages occasioned by it, and established the pond raised by it, as their reservoir, under the act.

The result of this view is, that the company had the right to maintain this dam, to raise a head of water both to supply the navigable canal and also to work mills; that they adopted this dam, then recently built, established the pond as a reservoir, and gave notice of it, according to law; so that the claim for damages on the part of any owner, whose lands were flowed by it, was a claim for all the damage occasioned by the use of the company's franchise, and of course embraced all the damage done to the complainant's land by flowing, for all the uses of the water, to which the company had a right to apply it, including as well the mill power as the supply of the canal with water. The damages, therefore, now sought to be recovered, have been paid by the canal company, under whom the respondents virtually hold their mill power.

This appears to be the ground, upon which the complainant acted at the time. If the canal company and the mill owners were wholly independent of each other; if the complainant went for and obtained damage from the canal company, for raising and using the water for supplying the canal only, and the raising of it for mills was another and different use not compensated for by those damages, — his claim against the mill owners was as good then as it is now. But he did not so consider it, and therefore made his claim against the canal company, and not against the mill owners. And in our opinion this was right. In theory of law, his claim was for damage done to his lands, by the erection of a dam for all the purposes within the franchise granted to the company, which was to raise water and use it for the supply of the canal, and for the working of mills, and of course such were the damages awarded and paid. The complainant having thus claimed and received a full compensation for a perpetual easement to flow his lands, for purposes of a public or *quasi* public nature, equity corresponds with the law in declaring him not entitled to a further compensation.

II. But it is further argued, and perhaps this may be regarded as the main point relied upon, that the mill privileges were merely incidental to the maintenance of the canal for navigation; that the canal having been abandoned by the company, and navigation therein having become impracticable by the filling up of portions of it, the mill privileges, and all derivative and dependent rights, are gone. If the fact were true, it might be quite questionable whether the conclusion, to the extent stated, would follow. If, before such an abandonment, the company had acquired a mill privilege, as they lawfully might, and had alienated it by a valid conveyance to another, whose right would thereby become vested, it may be doubted whether even a forfeiture of its franchises by the company, by a judgment, would defeat the right of an alienee taking under such title, valid at the time it was made.

But passing over this consideration with the above remark only, we are to consider the nature of this alleged abandonment, and its legal effect. It is true, that the use of the canal, as a navigable canal, has been discontinued so far as the same was in Massachusetts, and the company have sold to the railroad corporation the bed of their canal; but this was done under an express **enactment of the legislature,** authorizing such sale, and declaring that it should not work a forfeiture. *St.* 1844, *c.* 166

This act is short, but very significant and efficacious. Its avowed purpose is to facilitate the construction of a railroad between Worcester and Providence, as a substitute for the canal; it authorizes the canal company to make sale of their entire property, or any part or portion thereof, and to convey the same to any purchaser or purchasers; which conveyance shall vest a good title to such property, though a change of use to other public purposes may follow such sale.

This last provision, and indeed the whole act, was founded on a principle which has been decided in this commonwealth, and is now well settled, that where, under the authority of the legislature, in virtue of the sovereign power of eminent domain, private property has been taken for a public use,

and a full compensation for a perpetual easement in land has been paid to the owner therefor, and afterwards the land is appropriated to a public use of a like kind, as where a turnpike has by law been converted into a common highway, no new claim for compensation can be sustained by the owner of the land over which it passes.

In pursuance of this principle, we presume, the act in question authorizes the canal company to sell the land over which the canal was located for railroad purposes only. The second section provides, that the sale of the canal, or any portion of the works thereof, shall not operate to effect a forfeiture of any of the vested rights of the company to the dams, &c., but the right to maintain the same shall continue in the company and their assigns, though the canal shall be discontinued as a navigable highway. The third section provides, that the dams, which have been erected or raised by the company in the bed of the Blackstone river, may be maintained by the several mill owners, at the same height, &c., for the exclusive benefit of such mill owners, their heirs and assigns. In literal strictness, the dam in question was not erected or raised by the canal company; but as it was adopted, the damage caused by it paid for by the company, and, as we must presume, with the consent of the owners, as it exempted them from making the same payment, it is within the spirit and equity of the act.

By authority of this act, the canal company by their deed dated the 4th of January, 1846, sold and conveyed to the Providence and Worcester Railroad company the entire body, tract, bed and bottom, or right of way in that part of the canal lying within the jurisdiction of Massachusetts, with locks, &c., for railroad purposes only, and so far as the same should be used and appropriated to railroad purposes. The deed further states, that the reservoirs owned by the grantors, with the land, dams, &c., the waters, &c., and the waters of Blackstone river retained by such dams, are expressly reserved to the canal company; also, that the right acquired by any person to draw or conduct water through the canal, for mill purposes, irrigation or otherwise, shall not

be injured or affected by said deed, but such rights are to remain in full force.

This is the deed, made pursuant to the authority of a legislative act, which is relied upon as an abandonment by the company of their franchise, and a forfeiture of their rights. The effect of this deed undoubtedly was, to put an end to the use of the canal, as a navigable highway ; but the legis- lature, who are competent to decide what is for the public benefit, exempted the company from the further obligation of maintaining a navigable canal, and declared that it should not work a forfeiture of their charter, or any loss of their vested rights. There has been no forfeiture, no surrender, nothing other than the discontinuance of the canal as a navigable highway, to terminate the corporate existence and the continued action of this corporation ; and this stat- ute expressly preserves all the vested rights of the company, until they shall have conveyed them away, pursuant to its provisions.

If the legislature, as guardians of the rights of the public, had full and just authority to pass this act, to authorize the incorporated company to cease to perform the public duty of maintaining a navigable canal, and yet to secure them in the enjoyment of privileges given as a compensation for the performance of such public duty, then this act was valid; and we think there can be no doubt of the authority of the legislature on this subject.

The raising of a head of water, by a dam, for the support and maintenance of mills, is regarded so far as a public object, that the legislature have long exercised the power of author- izing owners to erect mills on their own lands, although in doing so, water is necessarily thrown back on the lands of others ; providing, at the same time, for the party damnified a reasonable compensation. This principle lies at the founda- tion of the mill acts, and renders them consistent with justice and the provision of the constitution. But these acts justi- fying the flowing of another's land, without his consent, can rest only on the right of eminent domain to take private

property for public use on making a compensation, which is incident to the right of sovereignty.

The original act of incorporation could rest only on this foundation, and it had two objects in view: the one, to provide for a navigable canal, a use manifestly public; the other, to erect and maintain mills, a use long since recognized as being so far a public one, as to warrant the necessary flowing of another's land, without his consent, making provision for a reasonable compensation. It may be admitted, in the present case, that this last purpose was incidental, subordinate, and applied only to heads of water, raised for the more prominent purpose of supplying the canal. Within these limits, it was a power or privilege granted to this company to erect and maintain mills, which was a purpose *quasi* public. Looking at these two objects as within the scope of the original act, it appears to us, that it was the obvious purpose of the legislature, in the act of 1844, whilst they intended to dispense with the further use of the canal, intended at the same time to continue in force that part of the act of incorporation, which authorized the company to maintain dams, necessary to the other contemplated use, that of supporting and working mills; and that they have done so by the terms of the act, and that the rights to mill powers, in these works, remain unchanged. Whether, by force of this act, this particular dam in the bed of the Blackstone river vested in the canal company, or has come to the respondents or their assignees, is immaterial to the present inquiry; because, in either case, no new right, no new ground of claim for damages, has accrued to the complainant.

It appears, that the canal, as a navigable highway, had become nearly useless; that it yielded little or no income to the owners, who had advanced a large amount of capital for its construction; and that there was no prospect of its becoming more beneficial to the public, or more profitable to the proprietors. Under these circumstances, it appears to us, that the legislature, yielding to the obvious necessity of consenting to its abandonment, acted within the scope of their

ʾust and constitutional power, and with equal wisdom and justice, in leaving to a public-spirited but losing company of individuals all the remnants of property which could be preserved from the general wreck.

Property which had been purchased and paid for by the company, and which, by the failure of the main enterprise, had become unnecessary to its promotion, and which could be disposed of, by the company, without injustice to any body, was obviously of this description. Of the equity of this rule, as applied to ordinary articles of property, such as boats, materials of buildings removed, and the like, there could be no doubt. And we think that valuable mill powers, mill privileges, and reservoirs, lawfully acquired by the company, within the scope of their authority, and obtained by the outlay of their own capital, though in their nature fixed and immovable, come within the same principle; and that it was competent for the legislature to secure the benefit of them to the company, and to provide for their continued corporate existence for the preservation and management of such articles, or the sale and disposition of them, and that they have done so by the act in question.

It is scarcely necessary to add, that regarding a mill privilege as a valuable property, capable of being conveyed and disposed of, it necessarily embraces the use of the head of water raised for working the mills, and the right of flowing as incident; that when such flowing extends over the lands of another, it is an easement in such lands annexed to the privilege; and that when gross damages have been paid, by the owner of the mill to the owner of the land, for a perpetual easement, the mill privilege carries with it such easement and right of flowing, free from all further claim for damages occasioned by such flowing.

The court are of opinion, and do adjudge, that the complainant is not entitled to damages as prayed for, and that the complaint be dismissed.