335 F.Supp. 615 (1971)
The NATIONAL BOARD OF the YOUNG WOMEN'S CHRISTIAN ASSOCIATION OF the U. S. A., Plaintiff,
v.
YOUNG WOMEN'S CHRISTIAN ASSOCIATION OF CHARLESTON, SOUTH CAROLINA, Defendant.
Civ. A. No. 70-180.
United States District Court, D. South Carolina, Charleston Division.
December 17, 1971.
*616 *617 Terrell Glenn, Columbia, S. C., Bernard R. Fielding, Charleston, S. C., Donovan, Leisure, Newton & Irvine, New York City, for plaintiff.
J. C. Long, Leonard L. Long, Jr., Charleston, S. C., Peden B. McLeod, Watersboro, S. C., for defendant.

ORDER
BLATT, District Judge.
This is a civil action for infringement of trademarks registered in the United States Patent Office, 15 U.S.C. Section 1114, as amended, and for unfair competition, namely common law trademark and trade name infringement, and is joined with a substantial and related claim based upon contract. The plaintiff claims the exclusive right to the use of the words, "Young Women's Christian Association." Jurisdiction of plaintiff's claim based on trademark infringement and unfair competition exists under 28 U.S.C. Sections 1338(a) and 1338(b). Plaintiff's claim based upon breach of contract is recognizable under the pendent jurisdiction of this Court. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
In its answer and counterclaim, defendant's principal contentions were: a) that plaintiff's registered trademarks were invalid because plaintiff's purpose and function had so drastically changed since these trademarks were registered that the continued recognition of the trademarks would constitute a fraud on, and a deception of, the public; b) that the issuance of a trademark to a religious association contravenes the First Amendment which forbids governmental establishment of religion; c) that the words "Young," "Women's," "Christian," and "Association," which plaintiff seeks to appropriate, are so descriptive in nature that they could never acquire a secondary meaning upon which plaintiff could base an action for unfair competition; d) that defendant used the words in question prior to the plaintiff's formation, and that plaintiff had not at that time established a secondary meaning to these words so as to be entitled to common law trademark protection; e) that, insofar as the breach of contract claim was concerned, the agreement with plaintiff was signed by officers of defendant without authority to bind defendant, and that plaintiff's own constitution exempted defendant from any requirement that it sign this agreement; f) that, as a complete defense to all causes of action, plaintiff's conduct in radically changing its original purpose for incorporation, and its espousal of certain causes, completely contrary to the avowed purposes for which plaintiff was originally founded, prevented plaintiff from seeking equitable relief.
*618 Plaintiff, the National Board of the Young Women's Christian Association of the U.S.A. (hereafter "National Board"), is the governing body of the Young Women's Christian Association of the U.S.A. (hereafter "National YWCA"). The National Board was incorporated under the laws of the State of New York on June 5, 1907, under the name "The National Board of the Young Women's Christian Associations of the United States of America." Pursuant to Chapter 258 of the laws of 1950 of New York, the name was changed to its present form which change merely omitted the letter "s" from the word, "Associations."
The purpose of the National YWCA is set forth in its present Constitution as follows:
"The Young Women's Christian Association of the United States of America, a movement rooted in the Christian faith as known in Jesus and nourished by the resources of that faith, seeks to respond to the barrier-breaking love of God in this day.
"The Association draws together into responsible membership women and girls of diverse experiences and faiths, that their lives may be opened to new understanding and deeper relationships and that together they may join in the struggle for peace and justice, freedom and dignity for all people."
The function of the National YWCA is set forth in its present Constitution as follows:
"The function of this organization shall be:
(a) To unite into an effective, continuing national organization the autonomous member Associations throughout the United States for the progressive fulfillment of the purpose of this organization in local, national and world relationships;
(b) To aid in establishing and developing autonomous units of the YWCA of the U.S.A.;
(c) To participate in the work of the World Young Women's Christian Association whose basis is `Faith in God the Father Almighty and in Jesus Christ His only Son our Lord and Savior, and in the Holy Spirit.'"
At the time of this trial, the National Board had over 400 affiliated community organizations, about 200 student organizations, and about 134 Y-Teen clubs throughout the United States. The National Board has for many years engaged in an extensive nationwide program of assistance to and supervision of these affiliated local organizations. Such continuing activities include the following: advisory services of consultants and specialists in areas of training of staff and volunteers; counselling of employed personnel; publication of administrative materials; assistance in planning, and provision of leaders for, locally administered community leadership development programs; consultative services with respect to new buildings and major renovations; development of standards to raise the quality of services to the community; administration of conventions and conferences for the development and furtherance of a national program; and promotion of the YWCA program and goals through the national media.
Defendant, the Young Women's Christian Association of Charleston, South Carolina (hereinafter "Charleston YWCA"), is a corporation existing under the laws of the State of South Carolina. The Charleston YWCA was organized in 1903. In 1906, when the plaintiff, National Board, was formed, the Charleston YWCA applied for charter membership and became affiliated with the National Board.
In order to remain affiliated with the National Board, each local association was required to meet all the requirements of membership as set forth in Section 3 of Article II of the Constitution of the National YWCA. In 1958, the Constitution was amended pursuant to the amendatory provisions thereof, to add *619 a new requirement for membership of local associations. The new requirement for membership, Article II, § 3(a), reads as follows:
"Each Association shall signify by a written statement its acceptance of the Constitution of the National Association and its agreement to give up the use of the name and symbol if it should become disaffiliated."
On May 19, 1959, the National Board received the following instrument entitled "Statement and Record Obligation":
"The Young Women's Christian Association of Charleston, South Carolina signifies by this statement that it accepts the Constitution of the National Association as revised and agrees to give up the use of the name and symbol if it should ever become disaffiliated."
The statement was dated May 13, 1959, and carried the signatures of both the president and the executive director of the defendant then in office.
Until 1969, when at its own request, the Charleston YWCA was disaffiliated, the defendant was a member of the National YWCA and, therefore, an affiliate of the plaintiff. Since its disaffiliation, the defendant has continued to use the name "Young Women's Christian Association" and other symbols whose exclusive use is claimed by the plaintiff.
The National Board is the owner of five collective marks registered in the United States Patent Office under the provisions of the Trademark Act of 1946, 15 U.S.C. § 1051, et seq. These marks are as follows:
1. Collective Mark consisting of the slanted letters "YWCA", Registration No. 606,539, first used in or about 1887;
2. Collective Mark consisting of a triangle crossed by a bar containing the block letters "YWCA", Registration No. 632,427, first used in or about 1918;
3. Collective Mark consisting of a triangle crossed by a bar containing the block letters "YWCA", Registration No. 756,566, first used in or about 1918;
4. Collective Mark consisting of the block letters "Y-TEEN", Registration No. 581,709, first used in 1946; and
5. Collective Mark consisting of a globe superimposed upon a triangle containing the block letters "Y-TEEN", Registration No. 659,630, first used in 1946.
The registration of these marks upon the principal register at the United States Patent Office created a presumption of their validity and of plaintiff's ownership and exclusive right to their use. 15 U.S.C. Section 1057(b).
In addition to its five registered marks, the National Board claims ownership of a common law trade name, "Young Women's Christian Association", and a common law mark consisting of the letters "YWCA", both used to indicate membership in the Young Women's Christian Association of the U.S.A. The common law mark, YWCA, is depicted in United States Patent Office Collective Membership Mark No. 763,279, which mark plaintiff inadvertently allowed to become cancelled about January, 1970, for failure to file an affidavit of continued use as required by Section 8(b) of the Trademark Act of 1946, 15 U.S.C. § 1058(b). The National Board has applied for reregistration of this mark and the application was pending at the time of this trial.
The ownership and control of the marks listed above is retained by the National Board. Permission to use the name, "Young Women's Christian Association", and the marks is automatically extended to the local affiliated associations which fulfill and maintain the constitutional requirements for member associations. These associations use the marks on such items as buildings, offices, camps, signs, corporate records, business records and stationery. Permission to use any of the marks on items to be given as awards or items to be sold, such as jewelry, printed material or wearing apparel, may also be granted by the National Board upon application by one or more local affiliated associations.
*620 As part of its program of furthering the purpose and goals of the National YWCA, the National Board has used great care and has gone to substantial expense and effort in popularizing its marks throughout the United States, including the State of South Carolina. By virtue of skillful and close consultation with, and supervision of, affiliated associations by the National Board, the plaintiff and its affiliated associations have developed throughout the United States a high reputation for service to the community and to individuals wishing to use their recreational and educational facilities and housing accommodations. The marks are widely recognized and respected as identifying organizations, services, facilities and goods connected with, supervised by, and meeting the high standards of the National Board.
Turning to the issues raised by defendant's answer and counterclaim, because the defendant contends that its existence before the formation of the plaintiff in 1906 gives it a prior right to the use of the name "Young Women's Christian Association", and the abbreviation "YWCA," it is necessary to consider the history of the YWCA in the United States. The following summary is based upon the testimony of plaintiff's witness, Mrs. Marti, whose knowledge springs from fifty years experience in YWCA work and upon a book written by Elizabeth Wilson in 1916, entitled Fifty Years of Association Work Among Young Women. Parts of Mrs. Marti's testimony and the book itself were admittedly hearsay in nature, but were, nevertheless, admitted into evidence, over defendant's objection, as historical accounts of events for which no direct testimony was available. (I. F. & A. M. Masons v. Most Worshipful Prince Hall Grand Lodge F. & A. Masons of Kentucky, 318 S.W.2d 46, 76 A.L.R.2d 1386 (Ky.1958); VI Wigmore, Evidence, § 1699 (3d ed., 1940); 32 C.J.S. Evidence § 720, page 1029.
The testimony of plaintiff's witness and the account in Miss Wilson's book were corroborated by documents from the historical archives of the plaintiff and were consistent with the brief historical account found in the opinion of the Illinois Supreme Court in International Committee Y. W. C. A. v. Young Women's Christian Ass'n of Chicago, 194 Ill. 194, 62 N.E. 551 (1901). Based on the foregoing historical sources, it appears that the YWCA movement had its origins in Great Britain during the 1850's and 1860's. In 1866, thirty ladies met in Boston to form the Boston Young Women's Christian Association, whose object was "the temporal, moral and religious welfare of young women who are dependent on their own exertions for support." In the following years other cities organized similar organizations under the names "Young Women's Christian Association" or "Women's Christian Association." Associations were organized in Providence, Hartford, and Pittsburgh in 1867, in Cincinnati, Cleveland and St. Louis in 1868, and in Dayton, Utical, Washington, Buffalo and Philadelphia in 1870.
The above named local city associations had from their beginnings communicated informally among themselves, but it was not until October 8, 1871 (when the Women's Christian Association of Hartford, Connecticut, invited the officers of all similar associations known at that time to come and celebrate their fourth anniversary), that a national conference was held. The delegates to that meeting reported on their respective activities, elected a presiding officer, and laid plans for another meeting in Philadelphia in 1873.
Until 1875, the national meetings were merely conferences at which local associations reported on their local activities. However, that year it was proposed that a national organization be formed to promote the work of existing associations and to stimulate them in places where they did not exist. At the conference in Montreal in 1877, a constitution was adopted for the "International Conference of Women's Christian Associations."
*621 At a conference meeting in 1891, a permanent International Board of Women's and Young Women's Christian Associations was formed to unite in one central body all present and future Women's Christian Associations. The International organization also took action to control the use of the name of the association. A resolution adopted at that time required all organizations forming at that time to take the name of Young Women's Christian Association and an effort was made to get already existing associations to change to that name.
During the 1870's and 1880's, Young Women's Christian Associations or Young Ladies' Christian Associations were established in many of the colleges around the country, particularly in the Midwest. By 1885, there were seven state organizations of Student Young Women's Christian Associations which were loosely affiliated through biennial conferences. In that year they attempted to merge with the then International Conference. When the merger failed, they met at Lake Geneva, Wisconsin, in 1886, to form the National Young Women's Christian Associations. In 1889, the constitution was amended so as to admit Canadian associations, and the name changed to the International Committee of Young Women's Christian Associations. Its purpose was the promotion of the social, physical, intellectual and spiritual condition of young women. Its membership consisted of state associations and its headquarters was fixed in Chicago.
By 1891, the International Committee included both student and city associations and it embarked upon an extensive program for training local leaders or secretaries. It also conducted extensive missionary work around the world. By 1894, the International Committee joined with Britain, Norway and Sweden to organize the World's Young Women's Christian Association. In 1899, Canada dropped from membership in order to join the world group, and the International Committee became known as the American Committee of Young Women's Christian Associations.
On May 24, 1905, representatives of the International Board of Women's and Young Women's Christian Associations and the American Committee of the Young Women's Christian Associations met in New York City to discuss the possibility of merger. As a result of that meeting, a joint committee organized to formulate the details of union.
On December 5 and 6, 1906, a joint convention was held in New York, resolutions were passed unifying the associations into the Young Women's Christian Associations of the United States and organizing a National Board to govern the new organization. The National Board was incorporated on June 5, 1907, under the name "The National Board of the Young Women's Christian Asociations of the United States of America."
On the basis of this history, this Court has concluded that the long continued use by the National Board and its predecessors in interest, the American Committee and the International Board, since at least 1887, of the name "Young Women's Christian Association" and the letters "YWCA," has established the plaintiff as the first owner of the right to use these words and letters and given it the right to have that use protected.
In this connection, a religious, benevolent or fraternal organization is entitled to protect the use of its name against those who secede. Talbot v. Independent Order of Owls, (8 Cir.) 220 F. 660, 661; Grand Lodge I. B. & P. O. O. Elks of World v. Grand Lodge I. B. & P. O. O. Elks, (4 Cir.) 50 F.2d 860, 862-863; Grand Lodge I., B. P. O. O. Elks of the World v. Eureka Lodge No. 5, (4 Cir.) 114 F.2d 46, 48; Purcell v. Summers, (4 Cir.) 145 F.2d 979, 984-986; International Committee of Young Women's Christian Ass'n v. Young Women's Christian Ass'n of Chicago, 194 Ill. 194, 62 N.E. 551 (1901); Annotation, 37 A. L.R.3d 277; Board of Provincial Elders of Southern Province of Moravian Church v. Jones, 273 N.C. 174, 159 S.E. *622 2d 545 (dissenting opinion of Chief Judge Parker); Nims, Unfair Competition and Trademarks, § 86, page 256 (4th ed. 1947). This question was so well resolved by the Court of Appeals for the Fourth Circuit in the Purcell case, supra, that this Court feels it appropriate to quote therefrom:
"The question of protecting by injunction an eleemosynary or charitable organization, as distinguished from a business corporation, from unfair competition in the use of its name, was before us in Grand Lodge I. B. P. O. Elks v. Grand Lodge I. B. P. O. Elks, 4 Cir., 50 F.2d 860, 862, in which we examined the question thoroughly and laid down the rule, with the supporting authorities, as follows:
"`It is well established that a benevolent, fraternal, or social organization will be protected in the use of its name by injunction restraining another organization from using the same or another name so similar as to be misleading. (Citing authority.) The reasons underlying the rule are thus stated in Nims on Unfair Competition and Trademarks (3d Ed.) § 86: "The fact that a corporation is an eleemosynary or charitable one and has no goods to sell, and does not make money, does not take it out of the protection of the law of unfair competition. Distinct identity is just as important to such a company, oftentimes, as it is to a commercial company. Its financial creditits ability to raise funds, its general reputation, the credit of those managing it and supporting it, are all at stake if its name is filched away by some other organization, and the two become confused in the minds of the public."'"
With respect to defendant's alleged independent use of the name "Young Women's Christian Association," this Court is not convinced that the defendant ever acquired any primary right to the use of the name or the letters. The original minute book of the Charleston YWCA, introduced into evidence by defendant, clearly indicates that simultaneous with its formation the Charleston YWCA affiliated with the American Committee, plaintiff's predecessor in interest, and, therefore, defendant never had the opportunity to give this name and initials a secondary meaning peculiar to itself.
Furthermore, any separate existence that the Charleston YWCA might have had prior to plaintiff's formation in 1906, was merged with that of the plaintiff when the Charleston YWCA became a charter member of the national association. In Grand Lodge I. B., P. O. O. Elks of the World v. Eureka Lodge No. 5, 114 F.2d 46, the Court of Appeals for the Fourth Circuit was faced with a similar situation when it considered the continued use of the name "Elks" by seceding members of the national organization. The Court noted:
"It is further argued that Eureka Lodge (the seceding member) should be permitted to use the word `Elks' in its corporate name because it existed as an `Elks' lodge prior to plaintiff's incorporation. The date of incorporation, however, is immaterial. Plaintiff order was organized a number of years before it was incorporated, and unquestionably granted a charter to Eureka Lodge in the year 1899 under which that lodge operated until the relationship was severed in 1939. Any separate existence which Eureka Lodge may have had prior to 1899 was merged with that of plaintiff on acceptance of the charter. The fact that the local lodge was incorporated in 1907 and again in 1913 under the laws of Virginia is unimportant. Such incorporation was as a subordinate lodge of plaintiff, not as an independent organization." (114 F.2d at 48) (Emphasis supplied).
Defendant also contended that the words "Young," "Women's," "Christian," and "Association," separately or taken together, are merely descriptive of a type of organization and its membership and are, therefore, not entitled to protection. However, the doctrine *623 that "secondary meaning" can be acquired even for a descriptive term is well established. In Little Tavern Shops v. Davis, (4 Cir.) 116 F.2d 903, the Court noted:
"When, by association with a business, a trade name has acquired a special significance as the name thereof, it will be protected by the courts even though it may have been a descriptive term in its original meaning." (116 F.2d at 905).
The Court in Little Tavern Shops considered the length of use, extent of advertising and the success of the business to find that, although the words "Little Tavern Shops" were descriptive of the places in which the business was conducted, they had acquired a secondary meaning to denote the plaintiff's stores. These factors constitute the well-recognized test for secondary meaning. (R. H. Macy & Co. v. Colorado Clothing Mfg. Co., (10 Cir.) 68 F.2d 690; W. G. Reardon Laboratories v. B. & B. Exterminators, (4 Cir.) 71 F.2d 515; Katz Drug Co. v. Katz, (E.D.Mo.) 89 F.Supp. 528, aff'd, 188 F.2d 696 (8 Cir.); 3 Callmann, Unfair Competition, Trademarks and Monopolies, § 77.3 (3d ed. 1969).
Discussing a similar issue, the Court of Appeals for the Fourth Circuit in the Reardon case, supra, where the question involved the words, "Mouse Seed," said at page 517 of 71 F.2d:
"The only question in this case, as to the trade-mark, is whether it is descriptive only and not susceptible of exclusive appropriation or whether it is uniquely suggestive. In considering this question it is plainly to be seen that the words used separately are descriptive. When one uses the word mouse there is no doubt as to what the word describes and there is nothing unique about it; its use brings at once to the mind the picture of a small rodent, a well known animal. Likewise the use of the word seed at once conveys to the mind something from which plants may be germinated, such as seed wheat or tobacco seed, or something to be used as food, such as bird seed. In the ordinary acceptance of the word `seed' it would never convey to the mind by its use alone anything poisonous. But when the two words are coupled together to make `Mouse Seed' there is no immediate meaning conveyed but a suggestion to the mind as to what the term could mean and the two words used in conjunction cease to be descriptive and become suggestive. Mature thought would probably lead to but one conclusionthat a mouse poison was indicatedbut it requires thought to reach this conclusion. The words used together possess an element of incongruity which make them unusual and unique and therefore, in our opinion, a valid trade-mark. In addition to this some weight must be given to the fact that the patent office registered `Mouse Seed' as a trade-mark showing that it was considered susceptible of appropriation as a mark. Chapin-Sacks Mfg. Co. v. Hendler Creamery Co.," supra [(4 Cir.) 254 F. 553].
Because of its long continued use in connection with the activities of the plaintiff and its predecessor associations, the name "Young Women's Christian Association" has acquired a secondary meaning as denoting the plaintiff and its affiliate members. Having acquired this secondary meaning, the name is entitled to protection, whether or not it could once have been said to be merely descriptive. International Committee of Y. W. C. A. v. Young Women's Christian Ass'n of Chicago, 194 Ill. 194, 62 N.E. 551 (1901); North American Aircoach Systems, Inc. v. North American Aviation Inc., (9 Cir.), 231 F.2d 205; 3 Callmann, Unfair Competition, Trademarks and Monopolies, § 77.3 (3d ed. 1969).
The defendant in its brief relied heavily upon the Charcoal Steak House of Charlotte, Inc. v. Staley, 263 N.C. 199, 139 S.E.2d 185 (1964) case as authority for the proposition that certain words or terms are inherently incapable of ever acquiring secondary meaning. According to this theory, the words "Young," *624 "Women's," "Christian," and "Association" are publici juris, and, ergo, cannot be appropriated for individual use. Without addressing the issue of whether some words are forever incapable of being appropriated, this Court is of the opinion that Charcoal Steak House is distinguishable, on its facts, from the instant case. "Charcoal Steak House," the words themselves, are grossly descriptive of the productcharcoal steaks sold by that business concern. Contradistinctly "Young," "Women's," "Christian," and "Association," as a commune of words does not suggest the product certain servicesprovided by that organization. Therefore, whatever secondary meaning that has attached springs not from the words themselves but from an identification of those words with a history of services provided. Therefore, to assert that these words in commune are incapable of ever acquiring secondary meaning is to ignore the clear import and definition of secondary meaning itself.
The Charleston YWCA's primary defense, and the basis of its counterclaim to declare plaintiff's registered trademarks invalid, was that plaintiff is committing a fraud upon both the public and the Patent Office by continuing to call itself a "Christian" association when its acts and statements demonstrate that it is no longer adhering to "Christian" principles. Such a defense of fraud, or "unclean hands," is well established in the law dealing with trademarks and unfair competition. In Worden & Co. v. California Fig Syrup Co., 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282 (1903), the United States Supreme Court held, in part:
". . . . . where any symbol or label claimed as a trade-mark is so constructed or worded as to make or contain a distinct assertion which is false, no property can be claimed on it, or, in other words, the right to the exclusive use of it cannot be maintained." (187 U.S. at 528, 23 S.Ct. at 164).
See also, Coca-Cola Co. v. Koke Co., 254 U.S. 143, 145, 41 S.Ct. 113, 65 L.Ed. 189 (1920); Talbot v. Independent Order of Owls, (8 Cir.) 220 F. 660, 661; Farmers' Educational & Coop. Union of America v. Farmers Educational & Coop. Union of America Iowa Division, (S.D.Iowa) 141 F.Supp. 820, 824, aff'd, 247 F.2d 809.
On motion made by plaintiff prior to trial, this Court held that any determination by a Court of Law as to whether plaintiff has deviated from a "Christian" purpose, or whether the use of the word "Christian" in its corporate name and trademarks amounts to such a misrepresentation as would invalidate plaintiff's rights under the trademark law, is prohibited by the First Amendment to the United States Constitution. Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); and Founding Church of Scientology v. United States, (D.C.Cir.) 409 F.2d 1146; cert. denied, 396 U.S. 963 (1969). The First Amendment protects the plaintiff against any governmental interference with its right of free evercise of religion. If plaintiff lost its valuable trademark rights because it did not conform to this Court's interpretation of "Christianity," it would be a very serious encroachment upon religious freedom. Therefore, at the trial of this case no evidence was admitted which had for its purpose the determination of whether the present policies and actions of the plaintiff comport with those Christian purposes espoused at plaintiff's inception.
On the other hand, this Court does not believe that the First Amendment prohibits the United States Patent Office from granting a trademark to the plaintiff or to any other religious organization, and defendant's motion, made on the morning of the first day of the trial, to dismiss the complaint for lack of federal jurisdiction on the ground that plaintiff's registered trademarks are invalid because their issuance by the Patent Office amounted to the establishment of a religious organization contrary to *625 the First Amendment, was denied. Such registration by the Patent Office is, this Court feels, analogous to a state granting a charter to a church or to a religious institution. Nothing in the Constitution prohibits a religious organization from owning propertyand a trademark is a property rightor prohibits the government from protecting that property from unlawful appropriation by others. By granting to a religious organization the exclusive use of a name, the Patent Office only deprives other religious groups of the use of that particular name, and such grant does not deny such other religious organizations the opportunity to establish competing groups having the same purpose but with different names.
Furthermore, it appears well settled that once infringement of a registered trademark is alleged and denied by the opposite side, jurisdiction of the Federal Court is established and such jurisdiction persists to decide other issues such as unfair competition and breach of contract regardless of a finding that the trademark is invalid. Hurn v. Oursler, 289 U.S. 238, 242, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); Armstrong Paint & Varnish Works Co. v. Nu-Enamel Corp., 305 U.S. 315, 325, 59 S.Ct. 191, 83 L.Ed. 195 (1938); Lyon v. Quality Courts United, (6 Cir.) 249 F.2d 790, 795-796; Recent Cases, 52 Harv.L.Rev. 680, 698 (1939).
As an additional ground for denying defendant's motion to dismiss, this Court noted that it raised a reason for invalidity of plaintiff's registered trademarks not raised in defendant's answer nor any of defendant's subsequent pleadings. Allowance of what amounted to a new defense at such a late date was not required by Rule 15 of the Federal Rules of Civil Procedure and would have been prejudicial to the plaintiff. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); 6 Wright and Miller, Federal Practice and Procedure: Civil, § 1487 (1971), and cases cited therein.
Being limited by this Court's earlier ruling that it would not decide whether the Christian purpose now followed by the National YWCA contrasted with that purpose formerly espoused by this group, the main thrust of the defendant's case at trial was to prove that the plaintiff had committed a fraud on the public by representing itself as an organization committed to the improvement of the morals and religious life of young women, when it was, in fact, an organization of an entirely different character. Uri v. Hirsch, (W.D.Mo.) 123 F. 568; Worden & Co. v. California Fig Syrup Co., 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282 (1903). To support this contention, defendant introduced into evidence numerous articles from plaintiff's magazine and extensively cross-examined plaintiff's witness about causes supported and positions taken by the National YWCA on various social and political issues of the day. There has admittedly been an intensification in involvement by the plaintiff with controversial issues, but no attempt to hide these activities has been shown. Indeed, whatever positions the National YWCA has taken, such positions have been espoused publicly in plaintiff's magazine, in open conventions and official reports of these conventions, and in newspaper accounts of its meetings. This Court does not believe that there has been any degree of deception that would allow it to hold that the plaintiff should lose its trademark rights because of any misrepresentations or fraud committed on the public.
The question remains, however, whether the plaintiff, its representatives or groups associated with it, have conducted themselves in such a manner that the plaintiff cannot meet the age-old maxim of "He who seeks equity must do equity, and must come into equity with clean hands." Our courts have generally held that the defects of a plaintiff do not offer grounds for allowing another to take advantage of him, and that such a defense "should be scrutinized with a critical *626 eye." Coca-Cola Co. v. Koke Co., 254 U.S. 143, 145, 41 S.Ct. 113, 65 L.Ed. 189 (1920); Farmers' Educational & Coop. Union of America v. Farmers Educational & Coop. Union of America, Iowa Division, (S.D.Iowa) 141 F.Supp. 820, 824, aff'd 247 F.2d 809.
This Court would be less than candid if it did not say that it was shocked at some of the actions undertaken by groups affiliated with the plaintiff, such groups urging the plaintiff to support the principles of the so-called "Black Manifesto" and suggesting that Eldridge Cleaver is a model whose doctrines should be followed. However, the plaintiff did not adopt these positions or causes which some of its members espoused, and even if said positions could make applicable the doctrine of "unclean hands," this Court finds that these actions are not chargeable to the plaintiff.
This Court was further shocked to learn of some of the positions taken by the plaintiff itself, such as attempting to judge the qualifications of a nominee to the Supreme Court of the United States and plaintiff's espousal of changes in certain moral principles that this Court feels should remain inviolate. However, the plaintiff's position on the use of marijuana and the reform of abortion laws is well within the ambit of the constitutional rights of freedom of speech and petition, and this is not sufficient cause to apply the doctrine of "unclean hands" to the plaintiff. Neither do all of the plaintiff's policies, taken in toto, allow, in this Court's opinion, the application of that doctrine to the National YWCA.
With respect to plaintiff's cause of action for defendant's breach of its agreement to give up use of the name and symbols of the National YWCA upon disaffiliation, defendant answered that the agreement was signed by its officers without its authority. Defendant produced one of the two signers of the instrument who admitted the authenticity of her signature, but who could not recall the events leading to her signing. Although the evidence concerning authority to execute the document was not conclusive, assuming the agreement was signed without authority, it was acted upon in good faith by the plaintiff and was ratified by the silence of the defendant over a period of ten years. (Barber v. Carolina Auto Sales, 236 S.C. 594, 115 S.E.2d 291, 294; Fochtman v. Clanton's Auto Auction Sales, 233 S.C. 581, 106 S.E.2d 272, 275.) Defendant could ratify the agreement even if plaintiff had knowledge that defendant's agents had no authority when they signed. (3 Am.Jur.(2), Agency, § 171, p. 556, n. 7 (1962); Restatement (Second), Agency, §§ 85(e) and 92(f). In this situation, where the plaintiff relied upon the signed Statement of Record and Obligation and where one of two innocent parties must suffer, assuming authority to sign was absent, equity requires the defendant to abide by its contract.
This Court does not find any ambiguity in the Statement of Record and Obligation. Neither does the Court attach any importance to the fact that the National YWCA's constitution and statement of purpose were thereafter amended because provision for such amendments were incorporated in the constitution when the defendant signed the agreement.
Further, it was defendant's position that plaintiff's constitution specifically excluded defendant from the provision thereof requiring the giving up of the use of the name on disaffiliation (page 4 of the National Board's Constitution, Article II, § 3(a)).
Article II, § 3(d) (i) (ii) of the National Board's Constitution (page 4) specifically stated: "Those Associations now affiliated on a church-membership basis and charter member Associations still operating under the 1906 special agreement on affiliation may be continued in accordance with the terms of their charters." (Emphasis added). This Court interprets such proviso to mean that the plaintiff had the option to allow defendant this privilege but obviously *627 plaintiff did not choose to make release in this fashion available to defendant.
This Court feels it appropriate, before concluding this Order, to review its holding on one motion presented as the trial of the case commenced on the merits.
Defendant moved under Rule 12(b), Rule 17, and Rule 19 of the Federal Rules of Civil Procedure for an order dismissing the complaint on the ground that plaintiff failed to join an indispensable party or, in the alternative, for an order to join such indispensable party as a party plaintiff. The indispensable party was alleged to be the Young Women's Christian Association of Greater Charleston, presently an affiliate of the plaintiff operating in the City of Charleston, South Carolina.
After defendant's disaffiliation by the National Board, a branch of the defendant split off from the defendant. This branch desired to continue its affiliation with the National Board and, after it reorganized itself as the Young Women's Christian Association of Greater Charleston, it applied for membership in the National YWCA. This membership was granted on February 2, 1970.
Even though the YWCA of Greater Charleston is now operating in direct competition with the defendant in the City of Charleston, this Court finds that it is no more than a mere licensee of the plaintiff and should not be considered an indispensable party to this action. (Volkswagenwerk Aktiengesellschaft v. Dreer, (E.D.Pa.) 224 F.Supp. 744, 746; Electronic Publishing Co. v. Zalytron Tube Corp., (S.D.N.Y.) 226 F. Supp. 760; American Plan Corp. v. State Loan and Finance Corp., (D.Del.) 278 F.Supp. 846, 848; E. W. Bliss Co. v. Cold Metal Process Co., (N.D.Ohio) 174 F.Supp. 99, 131-32; aff'd in part and rev'd in part, 285 F.2d 231 and 244; cert. denied, 366 U.S. 911, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961); 3A Moore's Federal Practice para. 19.14(2)).
Even if the YWCA of Greater Charleston could be considered an indispensable party, defendant's delay in making its motion until the very morning of trial would warrant its denial because of laches. (2 Barron and Holtzoff, Federal Practice and Procedure, § 518, pp. 174-75 (Wright ed. 1961)).
To have granted defendant's motion would have necessitated a delay of the trial and a substantial expense to plaintiff, since plaintiff was in court with its witnesses and attorneys who had traveled great distances and were ready for trial. (Pettit v. Geo. A. Rheman Co., (N.D.Ga.) 1 F.R.D. 271.)
Defendant contended that it was not aware that the YWCA of Greater Charleston was affiliated with the plaintiff until a week before trial. However, such information was available to the defendant in Plaintiff's Answers to Defendant's First Interrogatories, No. 10, served and filed on December 10, 1970, and defendant is, therefore, chargeable with such knowledge. Even though the defense of failure to join an indispensable party may be raised at any time in the proceedings, it may also be waived and a party with the necessary information to make a motion for joinder of an indispensable party cannot sit back and raise it at any point of his choosing. (Benger Laboratories Limited v. R. K. Laros Co., (E.D.Pa.) 24 F.R.D. 450).
Defendant's Answers to Plaintiff's Interrogatories, Nos. 1-40, other pamphlets and books produced by the plaintiff, and defendant's own scrapbooks, all introduced into evidence at the trial, indicate that after its disaffiliation on March 15, 1969, the defendant continued to use the names and trademarks belonging to the plaintiff. Specifically, the Charleston YWCA has:
a) Prepared, published and used documents in connection with the advertising of goods or services in which it is referred to as "YWCA" or "Young Women's Christian Association of Charleston."
b) Prepared, published and used documents in connection with advertising *628 of goods or services in which appear the symbol "Y-TEEN."
c) Caused to be broadcast over at least one radio station and two television stations in Charleston spot announcements in connection with advertisements of goods and services in which it is referred to as the "Y", the "YWCA" and the "Young Women's Christian Association of Charleston."
d) Caused to be printed in at least two newspapers, on an almost daily basis, advertisements and other announcements of its activities, goods and services in which it is referred to as the "Y", the "YWCA" and the "Young Women's Christian Association."
e) Sold and offered for sale or given away in commerce various items of athletic apparel, patches and cook books, on many of which it is referred to as the "Y", "YWCA" or "Young Women's Christian Association."
f) Has organized and sells tickets for house tours, dinners and other benefit activities open to the general public in which it is referred to as the "Y", "YWCA" or "Young Women's Christian Association."
g) Operates a day camp and offers adult and youth classes in many subjects including art, sewing, language, cooking and swimming, under the name "YWCA of Charleston."
h) Maintains a sign in front of its building at 21 George Street containing the letters "YWCA" and maintains other signs on its premises identifying itself as the "YWCA" or the "Young Women's Christian Association of Charleston."
Defendant advances the argument that simply by prefacing "YWCA" with "Charleston," this will obviate any potential confusion. This Court feels that the above argument is posited on the erroneous belief that the secondary meaning which the "Young Women's Christian Association" enjoys in Charleston is a product of the services provided by the local affiliate and has little or nothing to do with association with the National Board. Such a parochial attitude is understandable; the Charleston YWCA has certainly earned the good reputation it enjoys in this community. However, if a member of the Tulsa, Oklahoma, YWCA should transfer membership to the Charleston YWCA, she would expect the policies and standards of the local YWCA to be the same as those of her Tulsa Chapter. In addition, the services provided by each, while they might not be exactly the same, should at least parallel one another. This is the strength of the collective associationit is no more than the sum of its parts. Therefore, with disaffiliation, the National Board's control over at least the policies and standards of the local YWCA would cease, and one visiting or transferring to the Charleston organization would certainly be confused as to which YWCAthe defendant's organization or the plaintiff's affiliate in Charleston adhered to the same policies and standards as her home affiliate in Tulsa. Confusion does not have to be proven apodictically; a likelihood of confusion will suffice. This test of "likelihood of confusion" was aptly articulated by the United States Supreme Court in McLean v. Fleming, 96 U.S. 245, 251, 24 L.Ed. 828 (1877):
"What degree of resemblance is necessary to constitute an infringement is incapable of exact definition, as applicable to all cases. All that courts of justice can do, in that regard, is to say that no trader can adopt a trademark so resembling that of another trader, as that ordinary purchasers, buying with ordinary caution, are likely to be misled."
This definition was quoted with approval by the Court of Appeals for the Fourth Circuit in Glenmore Distilleries Co. v. National Distilleries Products Corp., (4 Cir.) 101 F.2d 479, 480.
This Court concludes that it reasonably follows that the use by the Charleston YWCA of the name "Young Women's Christian Association", and the initials "YWCA", when it is not an affiliated member of the plaintiff, is likely to cause confusion and impede the *629 plaintiff in controlling and directing the operations for which it is responsible and for which it will be called upon to explain in the Charleston area. (American Kennel Club v. American Kennel Club of La., Inc., (E.D.La.) 216 F.Supp. 267; Metropolitan Opera Ass'n, Inc. v. Metropolitan Opera Ass'n of Chicago, Inc., (N.D.Ill.) 81 F.Supp. 127; Nims, Unfair Competition and Trademarks, § 86, p. 256 (4th ed. 1947)).
Having decided that the plaintiff is to be the successful party in this litigation, this Court still has within its power the authority to render fair and equitable treatment to the defendant and its membership, the wonderful women in Charleston who have, through their labors over many, many years, realized what must be a dream come true to them in the construction of their outstanding facilities and the development of the commendable and great programs which they have undertaken for their community.
The United States Supreme Court in Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), stated:
". . . The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." (321 U.S. 329-330, 64 S.Ct. 592)
Because this Court has such authority, it will grant the plaintiff in general the relief that it seeks, but with certain modifications. In accordance with the foregoing findings and conclusions, it is
Ordered, since the defendant has stated for the record that it no longer uses, nor does it desire or intend to use in the future, the marks depicted in plaintiff's registered trademarks, Registration Nos. 632,427; 756,556; 581,709; and 659,630, that within ten (10) days after the filing of this Order, the defendant cease and desist in any way using these four registered marks, or any marks confusingly similar to them.
Further ordered, in regard to the use of the name "Young Women's Christian Association" and the letters "YWCA", including the use of the letters depicted in plaintiff's registered trademark, Registration No. 606,539, although their use belongs exclusively with the plaintiff, in the exercise of this Court's discretion, in balancing the equities of the case, that the defendant can continue to use the name "Young Women's Christian Association" and the letters "YWCA" until June 30, 1972, but thereafter defendant shall cease and desist from such use.
Further ordered, that the defendant shall have the right after June 30, 1972, to use the words "Young," "Women's," "Christian" and "Association," and the letters "Y.", "W.", "C." and "A." in any combination so long as the word "Young" and the letter "Y" are not used as the first word or letter of any such grouping or combination.
Further ordered, that it is equitable under the circumstances here that each side shall pay its own costs, 28 U.S.C. § 1920, as amended, 62 Stat. 955 (1948) and Rule 54(d) of the Federal Rules of Civil Procedure; United States v. Bowden, (10 Cir.) 182 F.2d 251, 252; United States v. Erie R. Co., (6 Cir.) 200 F.2d 411, 412; Srybnik v. Epstein, (2 Cir.) 230 F.2d 683, 686.
This written Order is in confirmation of the oral Order delivered from the Bench by the Court at the completion of the trial of this case and the findings and conclusions hereinabove set forth shall constitute this Court's compliance with Rule 52(a) of the Federal Rules of Civil Procedure.